[Civ. No. 14950. Second Dist., Div. Three. Apr. 30, 1946.]

W. P. NUTTER et al., Respondents, v. CITY OF SANTA MONICA et al., Appellants.

Carvel C. Torrence and C. W. McInerny, City Attorneys, and Hector P. Baida, Assistant City Attorney, for Appellants.

A. L. Wirin, J. B. Tietz and Abe F. Levy for Respondents.

Katz, Gallagher & Margolis and Entenza & Gramer as Amici Curiae on behalf of Respondents.

SHINN, J.—The city of Santa Monica operates a local and intercity motor coach line, serving the public in the city of Santa Monica, with one branch extending into the westerly section of the city of Los Angeles. The city employs 63 bus operators, 62 of them being members of Lodge No. 22 of the Brotherhood of Railroad Trainmen; they have designated the brotherhood as their collective bargaining agent. Plaintiffs are members and representatives of the brotherhood and they brought this action as such, and in behalf of the members of the brotherhood and of Lodge No. 22 against the city of Santa Monica and defendants Freeman, Millikan and Murray, as commissioners and members of the city council. Defendant Freeman is the commissioner in charge of the city's transportation lines. Plaintiffs, as representatives of the brotherhood, have appeared before Mr. Freeman upon numerous occasions, and before the other commissioners, for the purpose

of negotiating a contract between the city and the brotherhood governing the terms and conditions of employment of the bus operators. They have also requested the city to acknowledge that the brotherhood is the duly selected and authorized bargaining agent of the employees. Defendant commissioners have at all times received plaintiffs and entertained their complaints and suggestions but they have refused to recognize, in writing or otherwise, the brotherhood as the representative of the employees for the purpose of negotiating a contract. No contract has ever been proposed to the city by the plaintiffs; the discussions never reached that point, but it is the avowed purpose of plaintiffs to negotiate and enter into a contract between the brotherhood and the city, once the brotherhood has been recognized as the representative of the employees, authorized to negotiate such contract. It is the position of defendants, acting under advice of the city attorney, that the employees of the city may become members of the brotherhood or any other organization, and that such organized group may make representations or suggestions in behalf of the employees and otherwise advocate the cause of its said members. Accordingly, at divers times grievances have been stated and suggestions have been made to the commissioners by plaintiffs, and these, upon one occasion, resulted in the removal and replacement of a supervisor of the bus employees. Upon other occasions defendants have referred plaintiffs to the personnel board of the city for discussion of the matter of wages. Defendant commissioners have, however, refused to negotiate with plaintiffs as representatives of the brotherhood, or otherwise, for the purpose of agreeing upon and entering into a contract covering the terms and conditions of employment of the bus operators. They do not propose to enter into a labor contract with the brotherhood or with the employees or anyone representing them. They decline to discuss the terms of any proposed contract inasmuch as they do not intend to enter into one on behalf of the city.

The sole purpose of this action is to obtain a mandatory injunction requiring defendants to recognize the brotherhood and the individual plaintiffs, as members of the brotherhood, as the bargaining agents of the bus operators and requiring defendants to bargain collectively with the plaintiffs and the brotherhood, to the end that a voluntary agreement may be reached. After a trial a decree was entered, reading as follows: ''Wherefore, by reason of the law and the findings of

fact aforesaid it is ordered, adjudged and decreed that the plaintiffs do have and recover of and from the defendants their costs and disbursements incurred in said action amounting to the sum of $.... and that the defendants be and hereby are enjoined from refusing to recognize plaintiffs and/or the Brotherhood of Railroad Trainmen as the bargaining agent of the bus operators of the City of Santa Monica to the end that a voluntary agreement may be reached; and defendants are ordered to recognize the plaintiffs and the Brotherhood of Railroad Trainmen as the duly selected bargaining agents of the bus operator employees of the City of Santa Monica and to bargain collectively in good faith with plaintiffs as said representatives of the said employees of the defendants.''

Notwithstanding the indirect approach to the objective of the brotherhood, which is to secure a contract with the city, the judgment, which enjoins defendants from refusing to recognize the brotherhood as bargaining agent ''to the end that a voluntary agreement may be reached,'' amounts to a declaration that the city and the defendant commissioners are under a legal duty to enter into a contract with the brotherhood, as representatives of the bus operators, if the terms can be agreed upon, and they are commanded to negotiate with plaintiffs for that sole purpose.

The theory of plaintiffs is that such legal duty exists by virtue of certain sections of the Labor Code and that the court may, under its general equity powers, compel the defendants to perform that duty. The defendants maintain that the Labor Code sections have no application to municipal corporations, they deny that those sections impose upon employers a legal duty to enter into labor contracts, or to bargain collectively for the purpose of negotiating the terms of labor contracts, and they urge other defenses to the action.

Section 921 of the Labor Code bans all promises to join or not to join or remain or not to remain a member of a labor organization or an employer organization, as against public policy. The act of coercing any person to enter into an agreement not to join a labor organization as a condition of securing or continuing in employment is declared to be a misdemeanor by section 922. Section 923 reads as follows:

''In the interpretation and application of this chapter, the public policy of this State is declared as follows: Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental

authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

The discussion of these sections in the briefs covers a wide field. Plaintiffs contend that they set up the equivalent of the National Labor Relations Act, and a policy which the courts must define and administer under their general equity powers. Defendants criticize the judgment as judicial legislation, and in other respects. Whatever our views may be as to the authority of the courts, dependent upon these sections, to compel affirmative action on the part of either employers or employees in private industry, it would be inappropriate to state them here, since we have reached the conclusion that it was not the purpose of the Legislature, in the enactment of section 923, to inaugurate a state policy with reference to labor relations which would be applicable to the state or its political subdivisions. The purpose of the legislation is illuminated by the emphasis laid upon the evils which are sought to be corrected and the means by which correction is sought to be accomplished. The objective, we think, is stated in a nut shell in the sentence, "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees." Other declarations follow and when these are considered as a whole, they mean, as we interpret them, that it is the policy of the state to safeguard employees from entering into or being bound by agreements that are not voluntary upon their part; a contract negotiated with unorganized workers is not a voluntary agreement, for the reason that "the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment"; voluntary agreement is one that is negotiated

by representatives of the employees, chosen without interference, restraint or coercion on the part of employers or their agents.

The several sections relate to the field of industry in which employer-employee relationships are fixed by contract. This is essentially the field of private industry. Section 923 recites that "Government authority has permitted and encouraged employers to organize in the corporate and other forms of capital control," as a basic fact, which makes it desirable that labor also be organized in order that its ranks may present a united front in negotiating with organized capital. It is well recognized that a serious obstacle in the way of better labor relationships has been the reluctance of employers to concede a greater share of the profits of industry to labor, whether in the form of higher wages, shorter hours, or other privileges the expense of which would be borne by employers and which would present the threat of reducing profits. The Legislature recognized that there has been, and is, oppression of labor in the field of private industry, where there has not been freedom of contract. The incentive of personal gain which is reflected in large profits and the expansion of business inheres in private ownership, but there is no intimation in the Labor Code sections that that incentive and its attendant evils are found in public employment. The text of section 923 indicates that the Legislature has not discerned in public employment the existence of the conflicts between labor and capital that exist in private industry. The reason for the silence of the Legislature upon that subject is not obscure. In *Mugford* v. *Mayor and Council of Baltimore* (1944), Circuit Court No. 2 of Baltimore City, Maryland, 9 Mun. Law Journal 46, the court expressed it in the following appropriate language:

"The distinction between private employment and public service is an important one. Private employers if not restrained by law, are free to adopt any policy toward their employes which they believe calculated to promote the success of their enterprises, without regard to its effect upon the welfare of the employes; and it is therefore proper to restrain this freedom to some degree, and to safeguard the right of the workers to combine with each other, and to use the strength of this union in bargaining in the matter of wages, hours, terms and conditions of employment, and to strike if need be.

"In the field of public employment, on the other hand, altogether different conditions prevail. Public officers do not have

the same incentive to oppress the worker; and fair treatment sought to be coerced by collective bargaining in the field of private employment, is in the public field, to a large extent, compelled by law. Public officers, therefore, do not have the same freedom of action which private employers enjoy. Their authority is confided to them by public law, and by that law is limited. That authority may not be delegated or surrendered to others, since it is public property. And so it has been almost uniformly held that governmental authority may not discriminate in favor of union labor.''

In declaring the policy of the state as found in the Labor Code sections, the Legislature affirmed a natural right on the part of labor in private industry to enjoy freedom of contract and it outlawed the type of contract which deprives workmen of the right of free collective bargaining. It is not, however, an accepted practice for public bodies to enter into contracts with the employees of publicly owned operations with respect to matters which are usually embraced in labor contracts in private industry. Those who enter public employment do not thereby acquire the right to arrange, by negotiation and contract, terms and conditions of employment which are defined by law or, under established systems, are subject to regulation by governmental bodies.

The principle espoused by section 923 is essentially the same as that fostered by the National Labor Relations Act, namely, the right of workmen to enjoy free collective bargaining over terms and conditions of employment. In adopting that act Congress did not recognize the existence of the right of collective bargaining in public employment and did not consider it necessary to adopt a national policy which would extend into the field of public employment. Section 2(2) of the act expressly excepts from the definition of the term ''employer'' the United States and any state or political subdivision thereof.

By Statutes 1913 (chap. 590, p. 1035; Deering's Gen. Laws, 1931, Act 1400), a civil service system for the state was created by the Legislature, affecting state employees, with the exceptions enumerated in the act or the Constitution. A more comprehensive act was passed in 1937 (Stats. 1937, p. 2085; Deering's Gen. Laws, Act 1404). Among the purposes of the act, article I, section 1, are the following: ''Second. Appointments are based upon merit and fitness ascertained through practical and competitive examination. Third. State civil

service employment is made a career by providing for security of tenure and the advancement of employees within the service wherever practicable. . . . Fifth. A high morale is developed among State civil service employees by providing adequately for leaves of absence, vacations, and other considerations for the general welfare of said employees. Sixth. Tenure of civil service employment is subject to good behavior, efficiency, the necessity for the performance of the work, and appropriation of sufficient funds.'' In fixing salaries, consideration must be given ''to the prevailing rates for comparable service in other public employment and in private business, improvement of living standards, the current costs of living, and the State's financial condition.'' (§ 70.) Minimum salaries and salary adjustments are provided for. Salaries for laborers, workmen and mechanics employed on an hourly or per diem basis must not be below the general prevailing rate for the various localities in which the labor is performed. (§ 71.) There is a comprehensive scheme for permanency of tenure during good behavior, for promotion, demotion, suspension, reprimand and removal, with discipline or dismissal permitted only after a trial upon written charges. Preferences are given to veterans and to those who have served as active nurses in the American Red Cross or the Army and Navy Nurse Corps. (Art. II.)

County civil service systems may be set up under county charters by virtue of section 7½, article XI of the Constitution, added in 1911 and amended in 1914. (*Pullen* v. *Garrison*, 85 Cal.App. 706 [259 P. 1021].)

In 1935 the Legislature authorized the creation of a personal system, merit system, or civil service system in cities. (Stats. 1935, p. 380; Deering's Gen. Laws, Act 1401.) Such system may be one for ''the selection, employment, classification, advancement, suspension, discharge and retirement of appointive officers and employees,'' or it may ''consist merely of the setting up of minimum standards of employment and qualifications for the various classes of employment in said municipality, or may consist of a comprehensive civil service system as in the sound discretion of said legislative body may be for the best interests of the public service in said municipality.''

The city of Santa Monica adopted a personnel system in 1937, which provides an exclusive method for the employment,

suspension, demotion and dismissal of employees. So far as the state, municipalities and other political subdivisions are concerned, the policy of the state in the matter of public employment is reflected in its Constitution and laws and in the charters of counties and cities. It has been a progressive policy, developed through many years, and by means of considered legislation. We find nothing in the legislative history which would suggest, even remotely, that the Legislature would make a general surrender of its duty and responsibility to maintain public employment at a high level of desirability and efficiency.

The language of section 923 is broad enough to include state and municipal government, but general language in a statute is not sufficient, of itself, to indicate an intention to make it applicable to government. Where a statute is not expressly made applicable to government, it is for the courts to determine whether the Legislature intended it to apply to government. In making that determination, it is proper to consider all matters which, under the rules of statutory interpretation, shed light upon the legislative intention.

It is well established that general terms of a statute will not be construed as including government if the statute would operate to trench upon sovereign rights, injuriously affect the capacity to perform state functions or establish a right of action against the state. (*Mayrhofer* v. *Board of Education*, 89 Cal. 110 [26 P. 646, 23 Am.St.Rep. 451]; *Whittaker* v. *County of Tuolumne*, 96 Cal. 100 [30 P. 1016]; *Skelly* v. *Westminster School District*, 103 Cal. 652 [37 P. 643]; *Russ & Sons Co.* v. *Crichton*, 117 Cal. 695 [49 P. 1043]; *Balthasar* v. *Pacific Elec. Ry. Co.*, 187 Cal. 302 [202 P. 37, 19 A.L.R. 452]; *Irilarry* v. *City of San Diego*, 186 Cal. 535 [199 P. 1041]; *Engebretson* v. *City of San Diego*, 185 Cal. 475 [197 P. 651]; *Slayden* v. *O'Dea*, 182 Cal. 500 [189 P. 1066]; *Berton* v. *All Persons*, 176 Cal. 610 [170 P. 151].) In *Balthasar* v. *Pacific Elec. Ry. Co., supra,* the court quoted from Associate Justice Story of the Supreme Court of the United States, sitting in the first circuit in the case of *United States* v. *Hoar*, 2 Mason, 311 [Fed. Cas. No. 15,373], as follows: ''Where the government is not expressly or by necessary implication included, it ought to be clear from the nature of the mischiefs to be redressed, or the language used, that the government itself was in contemplation of the legislature,

before a court of law would be authorized to put such an interpretation upon any statute. In general, acts of the legislature are meant to regulate and direct the acts and rights of citizens; and in most cases the reasoning applicable to them applies with very different, and often contrary force to the government itself. It appears to me, therefore, to be a safe rule founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act. . . ." (See, also, *Estate of Miller,* 5 Cal.2d 588 [55 P.2d 491]; *Butterworth* v. *Boyd,* 12 Cal.2d 140 [82 P.2d 434, 126 A.L.R. 838]; *Miles* v. *Ryan,* 172 Cal. 205 [157 P. 5]; *Liebman* v. *Richmond,* 103 Cal.App. 354 [284 P. 731].) Other cases are listed in 23 California Jurisprudence, pages 625 and 769, in support of the same rule.

If we are correct in the views expressed, the purpose of the legislation in question was to commit the state to participation in a movement which has long been under way in the field of national legislation, and generally in state legislation, to improve the status of labor in the field of private industry. We believe the legislation had no other objective. We have pointed out that the text of section 923 ties in with private employment only, and thereby tends to exclude the subject of public employment. There is also the fact that the elaborate system of laws which constitutes the policy of the state in the domain of public employment would be largely nullified if the legislation should be construed as applicable to public employment, to the full extent that it is applicable to private employment. Government by law would then have to give way to government by contract, and this without action by the Legislature which expressed an intention to establish an entirely new system in the field of public employment.

It was argued to the learned trial judge, apparently with success, that the Legislature intended to require the state and municipalities to contract for terms and conditions of employment at least as to matters not covered by the laws of the state or the charters or ordinances of counties and cities. If there is any such undefined territory, the Legislature has made no attempt to identify it, and we cannot. If section 923 should be construed to mean merely that terms and conditions of employment must be fixed by contract in all respects in

which they are not fixed by law, it would be illogical and meaningless, for the state and the municipalities would retain the power to cover the entire field of employment by broadening the base of legislation governing the same so as to leave none of the terms and conditions of employment unprovided for. So construed, the legislation manifestly would not affect sovereign powers or interfere with the capacity to perform governmental functions, but we cannot subscribe to this construction. An endeavor by the courts to define some limited field for the contract system would be an attempt at judicial legislation. The present system of public employment constitutes the state's policy and should stand, or it is entirely obsolete and wrong, depending upon whether the Labor Code sections were intended to relate only to private industry. If the Legislature intended to make public employment a matter of negotiation and contract, at all, it intended to give preference to the contract procedure over the existing system of laws, charters and ordinances as to all matters usually embraced in labor contracts. If a new policy has been announced to replace the existing one, the functions of government in a broad field which are now exercised by means of legislation, and through delegated authority, would be transferred to agencies which would have the power to bind the state, county and city government by contract. The rules of statutory construction we have stated forbid us to hold that this drastic result has been accomplished by the general phraseology of section 923, or by the failure to specifically except the matter of public employment.

It is also argued that terms and conditions of employment should be fixed by contract in all activities of the state or municipalities conducted in a proprietary capacity, if not in a governmental capacity. Much has been said in the briefs as to the capacity in which the city operates the bus lines, but that question, we think, is beside the point. If the courts were to say that the legislation relates to public employment in the exercise of proprietary functions, but not governmental functions, that would be judicial legislation. The distinction between employment in one field and the other would be wholly without legislative foundation. If any such distinction is to be drawn it must be by the Legislature. We are not aware of any rule of law which would furnish a basis for applying the provisions of section 923 to one group of public employees to the exclusion of all others.

█ There is one other matter which has a proper place in our discussion. In 1943 there was introduced Assembly Bill No. 651 to add a new section, 924, to the Labor Code, reading as follows: "Nothing in the laws of this State shall be deemed to excuse or exempt the State of California, or any political subdivision thereof, from the duty to bargain collectively with its employees other than peace officers, under the public policy of this State as laid down in this code, and the term 'employees' wherever used in this code shall be deemed to apply to such public employees in the same manner and to the same extent as to private employees." The draft was amended by substituting "section 923" for "this code" and the remainder of the text of the original draft. The bill was refused passage. The failure of this legislation does not, of course, constitute a legislative interpretation of section 923, but it is a fact which is entitled to some consideration.

It appears to us that the defendants have a proper conception of their duties. They have given and expect to give respectful consideration to complaints registered by the bus drivers or their representatives. It is not claimed that they have ever turned a deaf ear to the requests of the employees with respect to the improvement of working conditions. As we stated in the beginning, the demand which the plaintiffs have made upon defendants, and which is in dispute, is not for different conditions of employment; it is a demand for union recognition. Defendants have no desire to deal with the bus drivers as individuals or to refuse to deal with their representatives. There is no reason to believe that they would refuse any request or demand of the employees, in the absence of a labor contract, which they would be willing to incorporate in a contract. They do not refuse to consider making changes in terms and conditions of employment insofar as they are subject to arrangement; they only refuse to take the preliminary steps toward entering into a contract with the Brotherhood.

█ The word "negotiate" as used in section 923, and as used by the parties, means to confer regarding terms and conditions governing the employment of the bus operators, which, so far as agreed upon, would be incorporated in a contract between the city and the brotherhood. The command of the decree that defendants "bargain collectively" with the brotherhood has a like meaning. We think the Legislature has not imposed that duty upon municipalities.

In our opinion, the complaint stated no ground for relief, and the demurrer of the defendants should have been sustained.

The judgment is reversed.

Desmond, P. J., and Wood, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 27, 1946. Carter, J., and Schauer, J., voted for a hearing.