STATE OF MISSOURI EX REL. E. E. MOORE and L. G. DeCAMP, Individually and for and on Behalf of all Members of Division 691 of Springfield, Missouri, of the AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAYS AND MOTOR COACH EMPLOYEES OF AMERICA, Relators, v. VANCE JULIAN, C. W. BOUTIN, CARL C. MITCHELL, G. H. FRIELING, and JOHN A. WHITE, Members of and Constituting the STATE BOARD OF MEDIATION OF THE STATE OF MISSOURI, Respondents, No. 41183—222 S. W. (2d) 720.

Court en Banc, July 11, 1949.

Rehearing Denied, September 12, 1949.

540

*William A. Moon* for relators.

542

*J. E. Taylor,* Attorney General, *John R. Baty* and *Arthur M. O'Keefe,* Assistant Attorneys General, for respondent.

LEEDY, C. J.—Original proceeding in mandamus to compel the State Board of Mediation to take jurisdiction of an alleged labor dispute between the employees of the municipally owned and operated bus transportation system of Springfield and the Board of Public Utilities of that city. Relators Moore and DeCamp are president and secretary, respectively, of Division 691 of Springfield, Missouri, of the Amalgamated Association of Street, Electric Railways and Motor Coach Employees of America, a voluntary, unincorporated association commonly known as a labor union, whose members constitute all of the bus operators and bus garage and shop employees, together with the cashier and all clerks of the city's bus transportation system. Relators bring this action both in their individual capacities and as representatives of all other members of the union. Respondents are members of, and constitute the State Board of Mediation.

The facts are not in dispute, and the issues are issues of law. As to the facts, it is sufficient to say that the bus transportation system in the city of Springfield is and has been municipally owned since 1945. It is operated by and under the control of the Board of Public Utilities of that city. It appears that the union had what would ordinarily be recognized as collective bargaining agreements for the years 1946 and 1947 affecting wages, hours and working conditions. (Respondents concede the execution and existence of these writings, but they deny their legal effect as collective bargaining agreements.) The union, through its secretary, gave timely notice of its desire to make certain changes in its contract, and requested a meeting. Subsequently several conferences were held between relators and the Board of Public Utilities and its manager, but these were fruitless, and the parties were unable to agree upon a final settlement agreement. Thereafter all necessary procedural steps to invoke the jurisdiction of the State Board of Mediation were taken by relators, but that body declined to accept jurisdiction, and this action was brought to test the validity of that action.

In City of Springfield v. Clouse, et al., 356 Mo. 1239, 206 S. W. 2d 539, it was held that the organization of municipal employees into labor unions is not improper, but that the constitutional provision there involved, "That employees shall have the right to organize and to bargain collectively through representatives of their own choosing" (§ 29, Art. I, Const. of Mo., 1945), does not apply to public employees, and that certain statutes providing the organization and powers of cities of the second class prevent such cities from making collective bargaining agreements with their employees. However, in that case this observation was made: "We do not say that the General Assembly could not separate corporate functions, and employees engaged therein, and provide for their operation and management in some manner distinctly apart from other city functions (perhaps like the Tennessee Valley Authority under the federal government) so that employer and

employee relations could be handled on a basis similar to private industry. However, it is clear that this has not been done in our cities of the second class.''

Relators' principal contentions are that the General Assembly has, through the enactment of §§ 6610.1-6610.11, Mo. R. S. A., Laws 1945, p. 1270, as amended Laws 1947, p. 400 (authorizing the creation of a Board of Public Utilities), effected that character of separation of the corporate or proprietary functions of the city and employees engaged therein to which reference is made in the Clouse case, and that Laws 1947, p. 358, §§ 10178.101-10178.122, Mo. R. S. A., commonly known as the King-Thompson Act, expressly includes, and is made applicable to labor disputes in utilities operating under governmental [municipal] ownership and control. The case really turns upon a construction of these two acts.

Respondents make three points: (1) That there can be no collective bargaining between relators and the management of the bus trans-. portation system because the employees are public employees, and such employment is not a matter of collective bargaining; (2) That there has been no separation of the corporate functions from those governmental so as to confer the right of collective bargaining; and (3) That, in any event, the King-Thompson Act gives the board discretion as to whether it will take jurisdiction of any labor dispute, and that this discretion cannot be controlled by mandamus.

Adverting to the comment in the Clouse case anent the power of the Legislature to separate corporate functions, it will· be recalled that the opinion says, ''However, it is clear that this has not been done in our cities of the second class.'' It must be remembered that in so saying this court did not refer to Laws 1945, p. 1270, §§ 6610.1-6610.11, Mo. R. S. A., on which relators here rely. This is quite understandable, as an examination of the file in that case reveals the 1945 act was not mentioned in the briefs, and the Clouse case arose before the passage of that act, although decided here after its effective date. Moreover, the King-Thompson law was not even remotely involved there, and so we think relators are entitled to a hearing on the merits of the question now urged, and that they are not foreclosed by the Clouse case.

 Turning now to Laws 1945, p. 1270, §§ 6610.1-6610.11, Mo. R. S. A., empowering the establishment. by ordinance of a Board of Public Utilities in second-class cities, we find it was approved by the Governor on March 20, 1946, with an emergency clause. This act had been introduced by the three Representatives from Greene County, in which Springfield is located (House Journal, 63d General Assembly, 1945, p. 425). That city had recently taken over from private ownership, through purchase, these public utilities: The electric generating plant and distribution system, the gas distribution system, the steam heating system, and the bus transportation system here involved.

The novel method used in financing the acquisition of such utilities was approved by this court in City of Springfield v. Monday, 353 Mo. 981, 185 S. W. 2d 788. The emergency counted on was the fact that there was no statute authorizing any second-class city to establish a Board of Public Utilities in charge of and exercising control over the public utility or utilities owned and operated by such city, and that it was necessary in the interest of the public peace; etc., that such authorization be granted "in order that the board by this act created may immediately take charge of and exercise control over such utilities in the manner and for the purposes provided by this act." The Springfield ordinance was passed within thirty days thereafter.

§ 1 of the act directed and empowered any city of the second class owning or operating a bus transportation system (among other utilities) to establish by ordinance "an executive department to be known as the 'Board of Public Utilities', to consist of six persons of business experience, electors of said city, who have resided therein for a period of not less than two (2) years," for staggered terms of six years, to be appointed by the Commissioner of Public Property and Public Utilities and confirmed by the council.

§ 4 provides that the board "shall have the power, and it shall be its duty, to take charge of and exercise control over any . . . bus transportation system, or any other public utility which may be owned and operated by such city, . . . and shall enforce the performance of all contracts and work, and have charge and custody of all property, assets, books and records belonging or appertaining to such utility or utilities," with a proviso that "this act shall not be construed to authorize a sale of said utilities properties without a vote of the electorate of said city . . ."

§ 5 provides: "Said board *shall make all appointments and shall employ all officers, agents, and employees of said utilities, determine their qualifications and duties and fix their compensation.* All appointments shall be made on the basis of merit alone and no appointment shall be made on account of political services or affiliations. Such officers, agents and employees *shall hold their offices during the pleasure of said board and not thereafter.*" (Italics ours.)

§ 6 authorizes the board to "fix the rates subject to the approval of the city council, and from time to time make changes therein as the operation of said utility or utilities may require; and shall collect charges based upon said rates for the product and services of said utility or utilities." It gives the board charge of all work, and of the furnishing, acquisition and purchasing of all supplies of said utility or utilities, and the power to execute and enter into contracts pertaining thereto. Said section also provides that the board "shall make all necessary regulations for the operation and government of said utility or utilities."

§ 7 provides as follows: "All bills of such board and all salaries of its employees shall be allowed and paid in the same manner that bills and salaries of other officers and employees of such city are allowed and paid."

§ 8 provides, in part, that "At the beginning of each fiscal year the Board shall submit to the City Council of said city for its approval an annual budget;" etc.

§ 9, as originally enacted, provided that the board and the city council "shall have joint authority and control over the revenues and funds of such utilities not required to pay the usual and proper costs of operation," etc., with the further provision that if these two bodies "fail to agree as to the disposition of surplus funds not required for the usual and proper costs of operation," then the matter should be submitted to a vote of the people. But this section was repealed by Laws 1947, p. 400, and a new section enacted in lieu thereof providing for payment into the general revenue fund of a certain percentage (4% in the case of the bus transportation system) of the gross operating revenues of the utilities. The act provides that "said payments shall be in lieu of taxes previously paid upon such utility properties prior to ownership or operation by such city *and shall be the only payments to be made to such city by the Board of Public Utilities or from funds of such public utilities.*" (Italics ours.) This act carried an emergency clause reading as follows: "There being no statute in this state authorizing or providing for any payments by any such Board of Public Utilities or by any such public utility into the general revenue fund of any such city of the second class, and the financial condition of cities of the second class which now own and operate public utilities being such as to require additional revenues immediately, an emergency is declared to exist within the meaning of the Constitution, this act being necessary for the immediate preservation of the public health, peace and safety; and, therefore, this act shall be in full force and effect from and after its passage and approval."

We start with the premise that there is no attack upon the validity of the act, constitutional or otherwise, and we are only concerned with an interpretation of its effect. While it would serve no useful purpose to make a detailed analysis of the pre-existing statutes and compare them with the new, it is not amiss to notice that, first and foremost, the act creates a separate "executive department" to take charge of and exercise control over municipally owned utilities— functions concededly proprietary and not governmental in nature. This in itself is a considerable step in the direction of separation of corporate from governmental functions (insofar as public utilities and their employees are concerned), but this is not all. Consider the effect of the act upon the civil service provisions of the city's charter (§§ 6678-6688, R. S. '39 and Mo. R. S. A.). It is clear that the

provisions of § 5 vesting power in the Board of Public Utilities to make all appointments, and employ all officers, agents and employees of the utilities and *"determine their qualifications"* shows a clear legislative intent that the civil service provisions of the city's charter should not apply to such employees. It would be incongruous, if not impossible, to have two boards charged with the duty of determining qualifications of the same employees. Besides, public utility employees are to "hold their offices during the pleasure of said board [of utilities] and not thereafter." These reasons alone are sufficient to show the two acts are wholly inconsistent.

Moreover, and of equal importance is the further provision of § 5 vesting in the board the power to determine the duties and to fix the compensation of the employees. This is a novel and sweeping change, particularly when viewed in the light of certain other sections of Art. 3, Chap. 38, R. S. '39, notably § 6614 vesting the council "with all powers of legislation in municipal affairs . . . not inconsistent with the Constitution and laws of the state of Missouri, *and of this article,"* and § 6615 giving the council "control and supervision over all the departments of the city, *except as herein otherwise provided."* It is to be borne in mind that at legislative sessions the council may act only by ordinance, resolution or motion (§ 6617). As to employees in other departments, § 6652 provides: "Each commissioner shall have the right to appoint all officers and employees in the department under his immediate supervision, subject to the merit system . . . and may remove said officers ▓ and employees at his pleasure." And § 6659 provides that all "salaries and wages of appointive officers and employees of the city, *unless otherwise herein provided,* shall be fixed and paid by the city council acting as a whole," etc. But there are some elements which might seem to militate against the view of complete separation, such as the budgetary requirement of § 8, and the provisions of § 7 with reference to the allowance and payment of all salaries of the employees of the board "in the same manner that bills and salaries of other officers and employees of such city are allowed and paid," and the authority vested in the council by § 6 to approve rates fixed by the board; and, of course, the act contains no express legislative declaration of purpose as being to effectuate an arrangement by which employer-employee relations might be handled on a basis similar to that in private industry.

▓ Relators invoke the express provisions of the King-Thompson Act, Laws 1947, p. 358, §§ 10178.101-10178.122, Mo. R. S. A. As in the case of the other act we have just considered, there is no attack upon the constitutional validity of this King-Thompson Act, and the question presented is merely one of interpretation as to its applicability. It outlaws strikes and lockouts in labor disputes in public utilities, and applies to such disputes the principle of compulsory settlement. § 1 declares the policy of the state in respect to the regu-

lation of labor relations affecting public utilities in this language: "It is hereby declared to be the policy of the State that heat, light, power, sanitation, *transportation,* communication, and water are life essentials of the people; that the possibility of labor strife in utilities operating under governmental franchise or permit *or under governmental ownership and control* is a threat to the welfare and health of the people; that utilities so operating are clothed with public interest, *and the State's regulation of the labor relations affecting such public utilities is necessary in the public interest."* (Italics ours.)

In § 2, under "Definitions," we find the following:

"(a) The term 'public utility' shall include any person engaged in the business of producing, distributing, selling or otherwise furnishing electric light or power, heat, gas, steam, water, sewer service, *transportation excepting railroads,* communication, or any one or more of them to the people of Missouri.

"(b) The term 'person' means any individual, firm, copartnership, corporation, *municipal corporation,* company, association, or joint stock association; and includes any trustee, receiver, assignee, or personal representative thereof."

"(d) The term 'collective bargaining' shall be understood to embody the philosophy of bargaining by employees through representatives of their own choosing, and shall include the right of representatives of employees' units to be consulted and to bargain upon the exceptional as well as the routine wages, hours, rules, and working conditions.

"(e) The term 'labor dispute' shall involve any controversy between employer and employees as to hours, wages, and working conditions. The fact that employees have amicable relations with their employers shall not preclude the existence of a dispute among them concerning their representatives for collective bargaining purposes."

§ 8 of the act provides as follows: "Upon receipt of notice of any labor dispute between parties subject to this act, the board shall require such parties to keep it advised as to the progress of negotiations therein. Upon application of either party to a labor dispute or upon its own motion the board may fix a time and place for a conference between the parties to the dispute and the board or its representative, upon the issues involved in the labor dispute and shall take whatever steps it deems expedient to bring about a settlement of the dispute including assisting in negotiating and drafting a settlement agreement. It shall be the duty of all parties to a labor dispute to respond to the summons of the board for joint or several conferences with it or with its representatives and to continue in such conference until excused by the board or its representative."

It is provided by § 14 that "In the event that management of a utility and the representatives for collective bargaining purposes of

any craft or group of employees of such utility shall not have reached and executed a final agreement in writing as to all conditions of employment'' before the time specified in the act, or unless there has been an agreement to arbitrate, then a Public Hearing Panel (to be chosen in the manner therein provided) shall hold and complete public hearings on the requested contract changes, and report thereon to the Governor ''setting forth a statement of the controversy, a resume of the evidence submitted to it and its recommendations based thereon.'' If such recommendations are not accepted, and effective operation of the utility is threatened or interrupted, etc., the Governor is authorized to seize the plant, equipment or facility ''for the use and operation by the State of Missouri in the public interest.''

The act appears to have been taken from a 1946 act of the New Jersey Legislature. Laws of New Jersey, 1946, p. 87. The New Jersey act was amended in 1947 (Laws of New Jersey, 1947, p. 160), but that amendment (which dealt with compulsory arbitration) was not taken into account by our Legislature. Section after section of the two acts are identical in language and punctuation. But ours does depart from the original New Jersey version in some few respects, one of the most important of which is the inclusion of utilities operating under municipal ownership and control. Respondents' argument concerning its nonapplicability, notwithstanding the plain letter of the statute to the contrary, is that the act was passed and approved before the decision in the Clouse case, and ''Therefore, any suggestion or inference in the King-Thompson Act that municipal corporations and its employees were included in the scope of the law is superseded by the later court decision, and such provisions are of no effect at this time.'' True, the Legislature may not have included municipally owned utilities within the terms of the act had the Clouse case been decided at the time the law was enacted, but that is beside the point.

It is interesting to note that the act has been the subject of comment in a well-considered and exhaustive article by Professor Jerre S. Williams of the University of Texas, entitled ''The Compulsory Settlement of Contract Labor Disputes,'' appearing in 27 Texas Law Review, pp. 587-658, under date of May, 1949. In his analysis of the act he points out that ''In Missouri the seizure technique is almost the exclusive emphasis of the statute. The only reference to compulsory settlement is a brief statement to the effect that compulsory arbitration will be enforced by the Board where voluntary arbitration fails. [§ 18a]. No standards or details are set forth.''

The act applies well-established principles of labor law to public employees in the limited field to which the act applies, i. e., public utilities. In this connection it may be observed that the maintenance

and operation of a local bus transportation system is not traditionally an activity in which municipalities have engaged in the exercise of their governmental functions. On the other hand, such activity corresponds in all essentials to the business as formerly carried on under private ownership before the city acquired the facility. The Legislature was cognizant of these matters. In any event, it departed from the New Jersey act when it included disputes in municipally owned public utilities, so there is no question of inadvertence involved. The 1945 Board of Public Utilities Act having separated proprietary from governmental functions, and employees engaged therein, in cities of the second class, thus removing any impediment to the handling of employee-employer relations in municipally operated utilities on the same basis as in private industry, we cannot escape the conclusion that the King-Thompson Act must be construed as applying to labor disputes in municipally owned public utilities, at least in cities of the second class, and we so hold.

The remaining question is whether the board has discretion to take or refuse jurisdiction. § 8 of the act, defining its ▬▬▬ duties when a labor dispute arises, has been set out above. Respondents say that this section "is simply a direction that the Board may call the parties to a dispute before the Board and *may* take whatever further means it deems expedient to settle the dispute." The section uses the word "shall" twice and the word "may" once, the latter in the provision respecting the fixing of a time and place for a conference between the parties to the dispute and the board or its representative. From this circumstance it is argued that all of the duties enjoined by the section are to be construed as permissive and not mandatory. It will be observed that the first sentence of the section provides that upon receipt of a notice of any labor dispute between parties subject to the act, the board "*shall* require such parties to keep it advised as to the progress of negotiations therein." This is a requirement of affirmative action on the part of the board, and implies the exercise of jurisdiction. The section then provides that the board "*may* fix a time and place for a conference between the *parties to the dispute and the board* or its representative." Thus it will be seen that the discretion confided to the board is only in the matter of calling a *joint* conference—that is, one between "the *parties* to the dispute *and* the board or its representative." Such a conference may or may not be desirable. Either joint or several conferences are contemplated for it is to be noted that this section makes it "the duty of all parties to a labor dispute to respond to the summons of the board for joint or several conferences with it or with its representatives and to continue in such conference until excused by the board or its representative." Meanwhile, the board is required "to take whatever steps it deems expedient to bring about a settlement of the dispute," etc. It has no discretion to withhold

its mediation facilities in any labor dispute between parties subject to the act, as here. The alternative writ should be, and it is made peremptory. *Tipton, Conkling, Clark, Douglas*, and *Hyde, JJ.*, concur; *Ellison, J.*, concurs in result.