CITY OF FORT SMITH v. ARKANSAS STATE COUNCIL No. 38, AFSCME, AFL-CIO, ET AL

5-4736                                    433 S.W. 2d 153

Opinion Delivered October 21, 1968
[Rehearing denied November 25, 1968.]

410

*James A. Gilker* and *Daily & Woods* for appellant.

*Sam Sexton Jr.* for appellees.

*Gayle Windsor; Spitzberg, Mitchell & Hays, Glenn Zimmerman & William G. Fleming* briefs amuicus curiae.

GEORGE ROSE SMITH, Justice.    Under Amendment 34 to the Arkansas Constitution municipal employees have the right to belong to labor unions, but they do not have the right to strike against the government.    *Potts v. Hay*, 229 Ark. 830, 318 S.W. 2d 826 (1958). The principal question here is whether a city is under a duty to engage in collective bargaining with a union representing city employees.    This appeal is from a decree holding that the city must bargain in good faith with the union representatives.    The other issues in the case are of comparatively minor importance.

The record runs to almost 500 pages, but the controlling facts are not really complicated.    Many employees of the city of Fort Smith—the exact number is not now material—joined the appellee union, State Council No. 38 of the American Federation of State,

County, and Municipal Employees, AFL-CIO. On June 17, 1968, Jeane Lambie, the state president of the union, sent a letter to the city officials, asking that the union be recognized by the city for the purpose of collective bargaining about wages, hours, and conditions of employment. On the same day Mrs. Lambie appeared at a meeting of the city directors and renewed her request for recognition. No formal action was then taken by the directors.

On the following day the directors unanimously adopted a written statement of policy which declared, among other points, (a) that the determination of hours of work, salary, etc., was the responsibility of the board of directors and not a matter to be negotiated, (b) that a personnel officer had been made available to hear grievances, (c) that city employees do not have a right to strike or to picket, and (d) that should city employees stop work or picket they would be treated as having quit their jobs and would be replaced.

That statement was approved on June 18. On the next day the city administrator (a position similar to that of a city manager) attempted to arrange a series of departmental meetings at which the city directors' statement of policy would be read to the municipal employees. The first meeting scheduled was to have been with the sanitation department employees, who collected trash and garbage. It is quite apparent from the testimony that those on each side of the dispute were maneuvering to make it appear that the opposite side was in the wrong. That is, the city wanted it to appear that the workers had quit their jobs, while the union wanted it to appear that some of its members had been discharged because of their union membership. On this issue of fact the chancellor upheld the union's position. We think the weight of the evidence supports that conclusion.

After the sanitation department meeting, at which about twenty employees were discharged, members of

the union set up picket lines at several municipal facilities. A great many of the city's non-uniformed employees (the police and fire departments have not taken any part in the dispute) refused to cross the picket lines, so that some municipal services—especially garbage collection—were curtailed or discontinued entirely.

On June 20 the city filed this suit for an injunction against the picketing and other assertedly illegal acts. The union's answer and counterclaim asked that the city be required to bargain collectively with the union's representatives. Testimony was taken at several hearings.

The chancellor eventually entered two temporary orders, a final order, and a supplement to the final order, all of which are before us for review. The court found that the city's refusal to bargain with the union was contrary to law. The city was ordered to reinstate the discharged employees, and the employees were ordered to return to work. The city was enjoined from letting contracts to third persons for the performance of municipal services, such as garbage collection. The city was ordered to bargain collectively and in good faith with the union. To that end the court appointed three special masters in chancery, who were directed to assist the parties in their negotiations (in the manner of a mediation board) and to report progress to the court from time to time.

The court was in error in holding that the city was under a duty to bargain with the union's representatives. In the absence of a statute to the contrary the cases have held almost without exception that a municipality or other political subdivision is under no duty (whch we take to mean a legally enforceable duty) to bargain collectively with its employees about wages, hours, or working conditions. *Nutter* v. *City of Santa Monica,* 74 Cal. App. (2d) 292, 168 P. 2d 741 (1946); *Fellows* v. *LaTronica,* 151 Colo. 300, 377 P. 2d 547

(1962); *Miami Water Works Local No.* 654 v. *City of Miami,* 157 Fla. 445, 26 So. 2d 194, 165 A.L.R. 967 (1946); *Local Union 283, International B.E.W.* v. *Robison,* 91 Idaho 445, 423 P. 2d 999 (1967); *Wichita Public Schools Employees* v. *Smith,* 194 Kan. 2, 397 P. 2d 357 (1964); *City of Springfield* v. *Clouse,* 356 Mo. 1239, 206 S.W. 2d 539 (1947), distinguished but not overruled in *State ex rel. Moore* v. *Julian,* 359 Mo. 539, 222 S.W. 2d 720 (1949).

Basically, the reason for the rule is that the fixing of wages, hours, and the like is a legislative responsibility which cannot be delegated or bargained away. Several aspects of the matter were discussed in the *Wichita* case, *supra,* where the court said:

> The entire matter of qualifications, tenure, compensation and working conditions for any public employee involves the exercise of governmental powers which are exercised by or through legislative fiat. Under our form of government public office or public employment cannot become a matter of collective bargaining and contract.

> The objects of a political subdivision are governmental—not commercial. It is created for public purposes and has none of the peculiar characteristics of enterprises maintained for private gain. It has no authority to enter into negotiations with labor unions concerning wages and make such negotiations the basis for final appropriations. Strikes against a political subdivision to enforce collective bargaining would in effect amount to strikes against the government.

Some cases have held that a municipality or school district may voluntarily engage in collective bargaining. *Norwalk Teachers' Assn.* v. *Board of Education,* 138 Conn. 269, 83 A. 2d 482 (1951); *Chicago Division of the Education Assn.* v. *Board of Education,* 76 Ill. App. 2d 456, 222 N.E. 2d 243 (1966). Those cases do not assist

the appellees, for here the city directors are unwilling to engage in such bargaining. In one case cited by the appellees, *Local* 266, *International B.E.W.* v. *Salt River Project Agri. Imp.* & *Power Dist.*, 78 Ariz. 30, 275 P. 2d 393 (1954), the court did sustain the union's right to strike against an improvement district, but one of the reasons given was that the district was owned by private landholders; so the strike was not against the public.

We do not agree with the appellees' argument that the city is compelled by Ark. Stat. Ann. § 81-201 (Repl. 1960) to engage in collective bargaining. That section reads: ''Freedom of organized labor to bargain collectively, and freedom of unorganized labor to bargain individually is declared to be the public policy of the State under Amendment 34 to the Constitution.'' That section is merely a preamble to Act 101 of 1947—the enabling act for Amendment 34. Except for that prefatory statement of policy the act, like the amendment, deals only with the denial of employment on the basis of the employee's membership or nonmembership in a labor union. We are unable to read into that preamble, which is merely a statement of policy expressed in the most general terms, a specific command that municipalities engage in collective bargaining when requested to do so. Had the General Assembly intended that change in the law it would certainly have used more explicit language to accomplish its purpose.

During the oral argument counsel for the appellees, envisaging the possibility that the city might not be compelled to bargain collectively, suggested that nevertheless the union's right to present its grievances to the city officials ought to be recognized. No doubt that right does exist. The Bill of Rights protects the right of the people to assemble and to petition the government by address or remonstrance. Ark. Const., Art. 2, § 4. The Colorado court, in the *Fellows* case, *supra*, made this pertinent observation, with which we agree:

A proper exercise of the legislative function might well involve consultation and negotiation with spokesmen for public employees, but the ultimate responsibility rests with the legislative body and, under the record here presented, that responsibility cannot be contracted away.

We must decline the appellees' suggestion that we attempt to define precisely the extent to which the city officials are required to listen to the grievances of its employees, whether presented individually or collectively. There is no limit to the various fact situations in which the issue might arise. Experience has shown again and again that the courts' best course is to decide concrete cases as they are presented in adversary proceedings, rather than to speculate about theoretical or academic questions that may never arise in actual litigation.

We conclude that the court was in error in directing the city to bargain in good faith with the union, with the implication that a failure to do so might be punishable as a contempt of court. It follows from our decision upon the principal question that the court also erred in appointing what amounted to a mediation board and in enjoining the city from letting contracts for the performance of municipal services.

That part of the decree that directs the city to reinstate those employees who were wrongfully discharged is affirmed; in other respects the decree is reversed.

HARRIS, C.J., and JONES and BYRD, JJ., concur.

CONLEY BYRD, Justice. In concurring I place much more emphasis on the fact that Ark. Stat. Ann. § 81-201 (Repl. 1960), makes collective bargaining the public policy of this state and that the statute is also applicable to municipalities. It is true that Acts 1947, No. 101, of which § 81-201 is the first section, provides no sanction

for an employer who refuses to recognize a union and does not attempt to change public policy prohibiting strikes against a municipality or other government agency. However, I think the majority opinion is not exactly correct when it says the city has no duty to bargain collectively with its employees about wages, hours and working conditions. My understanding of the act is that the employees have no recourse to the courts for the enforcement of their right of collective bargaining where the city refuses their request.

This may be nothing more than the difference between accentuating the positive instead of the negative, but I certainly think that in view of the state's public policy, an employee of the city not only has the right to belong to a union, but has the correlative right to bargain over wages, hours and working conditions with the city through his union representative.

The lack of recourse to the courts or to the use of a strike may water down the effectiveness of the union's ability to represent him, but it does not prevent recourse to education of the public through publicity. It must be remembered that this phase of a union's activities has its effect upon community thinking. It is common knowledge that many people who work with their hands are incapable of expressing their grievances even after they have found the proper forum. Just as business finds it necessary to employ advertising agencies to sell its products or its message to the public, I think a man through his union dues should be entitled to the services of a union representative to settle or publish his grievances concerning the things most important to him, i.e., grievances concerning wages, hours and working conditions.

Concurring.

HARRIS, C.J. and JONES, J., join in this concurrence.