[L. A. No. 25676. In Bank. Oct. 3, 1960.]

LOS ANGELES METROPOLITAN TRANSIT AUTHORITY, Respondent, v. THE BROTHERHOOD OF RAILROAD TRAINMEN (an Unincorporated Association) et al., Appellants.

*Assigned by Chairman of Judicial Council.

Bodle, Fogel & Warren, Bodle & Fogel, George E. Bodle, Daniel Fogel and Stephen Reinhardt for Appellants.

Hirson & Horn and O. David Zimring as Amici Curiae on behalf of Appellants.

Musick, Peeler & Garrett, Gerald G. Kelly, Roderick M. Hills, Frederick B. Warder, Jr., Bruce A. Bevan, Jr., Thomas J. Reilly, Charles H. Tillinghast and Richard T. Apel, for Respondent.

GIBSON, C. J.—Plaintiff, a public corporation organized under the Los Angeles Metropolitan Transit Authority Act of 1957, operates facilities for the transportation of passengers in the counties of Los Angeles, Orange, Riverside, and San Bernardino. (Stats. 1957, ch. 547.)[1] The two principal transit companies in the Los Angeles area were acquired by plaintiff, and the employees of those companies, subject to normal turnover, are now employees of plaintiff. Defendant brotherhood is the exclusive bargaining representative of certain of plaintiff's employees, such as conductors, motormen, motor-coach operators, ground loaders, and trafficmen. This action was brought to obtain a declaratory judgment that plaintiff's employees represented by defendant brotherhood are without the legal right to strike because they are employees of a public corporation. The trial court so held, and defendants have appealed.

In the absence of legislative authorization public employees in general do not have the right to strike (see 31 A.L.R.2d 1142, 1159-1161), and the questions presented here are whether the act creating the transit authority gave its employees such a right and, if so, whether the statute is constitutional as applied to the employees represented by the brotherhood.

Subdivision (c) of section 3.6 of the act provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage *in other concerted activities for the purpose of collective bargaining or other mutual aid or protection*. . . . Notwithstanding any other provision of this act . . . the authority . . . shall enter into a written contract with the accredited representative of [its] employees governing wages, salaries, hours and working conditions. . . ." (Italics added.)

Language identical with the italicized words of subdivision (c) first appeared in section 2 of the Norris-LaGuardia Act (47 Stat. 70; 29 U.S.C., § 102), and it has been contained in

---

[1] The act was amended in 1959 (Stats. 1959, ch. 519), and, unless otherwise noted, references in this opinion to the act are to the Los Angeles Metropolitan Transit Authority Act of 1957 as amended in 1959.

The act declares that plaintiff is a "public corporation of the State of California" and that it is not a state agency as defined by section 11000 of the Government Code, which provides that as used in title 2 of the code "state agency" includes every state office, officer, department, division, bureau, board, and commission.

section 923 of our Labor Code since 1937.[2] The identical language was also used in section 7(a) of the National Industrial Recovery Act (48 Stat. 195, 198), section 7 of the National Labor Relations Act of 1935 (the Wagner Act, 49 Stat. 449, 452), and section 7 of the Labor-Management Relations Act of 1947 (the Taft-Hartley Act, 61 Stat. 136, 140; 29 U.S.C., § 157). The courts have uniformly interpreted these words as including the right to strike peacefully to enforce union demands with respect to wages, hours, and working conditions. (*Weber* v. *Anheuser-Busch, Inc.* (1955), 348 U.S. 468, 474-475 [75 S.Ct. 480, 99 L.Ed. 546]; *Amalgamated Association etc. M.C.E.* v. *Wisconsin Employment Relations Board* (1951), 340 U.S. 383, 389, 398 [71 S.Ct. 359, 95 L.Ed. 364, 22 A.L.R. 2d 874]; *International Union of United Automobile etc. Workers of America* v. *O'Brien* (1950), 339 U.S. 454, 456-457 [70 S.Ct. 781, 94 L.Ed. 978]; *Collins Baking Co.* v. *National Labor Relations Board*, 193 F.2d 483, 486; *National Labor Relations Board* v. *Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505; *G. C. Breidert Co.* v. *Sheet Metal etc. Assn.*, 139 Cal.App.2d 633, 638 [294 P.2d 93].) The cases have applied the language to a number of specific situations and have determined that it includes other activities as well as strikes but does not sanction all collective conduct of workingmen or all kinds of strikes; for example, sit-down strikes have not been included within the right to engage in other concerted activities. (See *International Union of United Automobile etc. Workers of America* v. *O'Brien* (1950), *supra*, 339 U.S. 454, 457-459; *International Union etc. A.F.L.* v. *Wisconsin Employment Relations Board* (1949), 336 U.S. 245, 255 et seq. [69 S.Ct. 516, 93 L.Ed. 651]; *Park & T.I. Corp.* v. *International etc. of Teamsters*, 27 Cal.2d 599, 604-605 [165 P.2d 891, 162 A.L.R. 1426].)

When legislation has been judicially construed and a subsequent statute on the same or an analogous subject is framed in the identical language, it will ordinarily be presumed that the Legislature intended that the language as used in the later enactment would be given a like interpretation. This rule is applicable to state statutes which are pat-

---

[2]Section 923 of the Labor Code provides in part: "Therefore it is necessary that the individual workman . . . shall be free from the interference, restraint, or coercion of employers . . . in the designation of . . . representatives or in self-organization or *in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.*" (Italics added.)

terned after federal statutes. (*Scripps etc. Hospital* v. *California Emp. Com.*, 24 Cal.2d 669, 677 [151 P.2d 109, 155 A.L.R. 360]; *Holmes* v. *McColgan*, 17 Cal.2d 426, 430 [110 P.2d 428]; *Union Oil Associates* v. *Johnson*, 2 Cal.2d 727, 734 [43 P.2d 291, 98 A.L.R. 1499].) Although the cases which have interpreted the italicized words involved private employees, the act before us incorporates the exact language, consisting of 16 words, found in the earlier statutes, and it is unlikely that the same words would have been repeated without any qualification in a later statute in the absence of an intent that they be given the construction previously adopted by the courts.

Terms such as "concerted activities" are commonly used by courts as well as legislative bodies to refer to strikes. This court, for example, on a number of occasions has used the words "concerted action" as an inclusive term referring to strikes, picketing, and boycotts. (See, e.g., *Petri Cleaners, Inc.* v. *Automotive Employees etc., Local No. 88*, 53 Cal.2d 455, 469 et seq. [2 Cal.Rptr. 470, 349 P.2d 76]; *Park & T.I. Corp.* v. *International etc. of Teamsters*, 27 Cal.2d 599, 603 [165 P.2d 891, 162 A.L.R. 1426]; *James* v. *Marinship Corp.*, 25 Cal.2d 721, 729 [155 P.2d 329, 160 A.L.R. 900].) Our codes provide that technical words and phrases, and others which have acquired "a peculiar and appropriate" meaning in law, are to be construed according to such meaning. (Civ. Code, § 13; Code Civ. Proc., § 16.)

Other provisions of the act support the conclusion that the Legislature granted plaintiff's employees the right to strike. The employees of the two transit companies taken over by plaintiff had the right to strike prior to acquisition, and the act provides that, when plaintiff acquires any privately owned public utility, it must observe all labor contracts of the utility and that no employee "shall suffer any worsening of his wages, seniority, pension, vacation or *other benefits* by reason of the acquisition." (Italics added.) (§ 3.6, subd. (e).) The fact that the Legislature contemplated a right to strike on the part of plaintiff's employees also appears from subdivision (h) of section 3.6 which provides that plaintiff's statutory obligation to bargain collectively extends to all matters which are "proper subjects of collective bargaining with a private employer." The question whether employees may strike and the circumstances under which they may do so are proper subjects of collective bargaining, and clauses

relating to strikes are commonly found in collective bargaining contracts. When these provisions of the act are considered together with the express requirement that plaintiff bargain collectively, it is obvious that the legislative intent was to depart from the traditional system of fixing the terms and conditions of governmental employment and to establish for plaintiff and its employees a system comparable to that existing between a privately owned public utility and its employees. A further indication of such an intent is found in subdivision (g) of section 3.6, which provides that plaintiff, when authorized by its employees, may make deductions from their wages and salaries for the payment of union dues or for ''any purpose for which deductions may be authorized by the employees of any private employer.'' To carry out its intent the Legislature chose the language which is found in statutes relating to private employees and which has been given a definite meaning through interpretation by the courts.

The right of public employees to strike has been sustained in two other jurisdictions even though the statutes did not, as here, contain provisions which specifically authorized the public employees in question to engage in collective bargaining and other concerted activities. *Local 266 etc. A.F.L.* v. *Salt River Project Agr. Imp. & Power Dist.*, 78 Ariz. 30 [275 P.2d 393, 396 et seq.], involved employees of an irrigation district which under section 7 of article 13 of the Arizona Constitution was declared to be a political subdivision of the state ''and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this Constitution or any law of the state or of the United States.'' A statute provided that the district could enter into ''all necessary contracts.'' The court, stating that the function of the district, which supplied power to 100,000 users, was business and economic and not political and governmental, held that the provision permitted but did not require collective bargaining contracts and that since such contracts were legal the employees could strike to enforce a demand for collective bargaining. *Board of Education* v. *Public School Employees' Union*, 233 Minn. 144 [45 N.W.2d 797, 800 et seq., 29 A.L.R.2d 424], concerned the interpretation of a Minnesota statute, applicable to employees generally, which prohibited the issuance of injunctions against strikes. The statute excepted from its provisions policemen, firemen, or any other public officials

charged with duties relating to public safety, and the court held that this exception by implication precluded the issuance of an injunction against a strike by school janitors. It was reasoned that the specific exclusion of some public employees indicated an intent to include all others. It is obvious that these two cases go much further in construing statutes in favor of the right of public employees to strike than we are required to go here, since the public employees involved in this case are specifically given the right to bargain collectively and to engage in other concerted activities in aid of such bargaining.

No case has been found which has denied public employees the right to strike where, as here, the employees were specifically authorized by statute to bargain collectively and engage in other concerted activities. The following cases are distinguishable because the public employees did not have the benefit of such legislation: *Newmarker* v. *Regents of University of Calif.*, 160 Cal.App.2d 640, 646 et seq. [325 P.2d 558]; *City of Los Angeles* v. *Los Angeles etc. Council*, 94 Cal.App. 2d 36, 46 et seq. [210 P.2d 305]; *Norwalk Teachers' Assn.* v. *Board of Education*, 138 Conn. 269 [83 A.2d 482, 484 et seq., 31 A.L.R.2d 1133]; *City of Manchester* v. *Manchester Teachers Guild*, 100 N.H. 507 [131 A.2d 59, 61 et seq.]; *International Brotherhood of Electrical Workers* v. *Grand River Dam Authority,* —— Okla. —— [292 P.2d 1018, 1020 et seq.]; *City of Pawtucket* v. *Pawtucket Teachers' Alliance,* —— R.I. —— [141 A.2d 624, 627 et seq.]; *Weakley County Municipal Electric System* v. *Vick* (Tenn. App.), 309 S.W.2d 792, 801 et seq.; *Port of Seattle* v. *International Longshoremen's & W. U.,* 52 Wn.2d 317 [324 P.2d 1099, 1101 et seq.]. Some of these cases are also distinguishable upon other grounds. For example, in the two California cases as well as the one from Tennessee it was held that collective bargaining contracts would be illegal under statutes setting forth particular methods of establishing wages and working conditions and that, accordingly, a strike to enforce collective bargaining demands would be a strike for an unlawful purpose. Here, as we have seen, the employer must bargain collectively and must enter into a written contract with the brotherhood to establish wages and working conditions.

The case of *United States* v. *United Mine Workers of America*, 330 U.S. 258 [67 S.Ct. 677, 91 L.Ed. 884], cited by plaintiff, is not helpful in determining the proper construction of statutory language permitting employees to engage

''in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'' The meaning of the quoted words was not at issue and was not discussed by the court. It was there held that the Norris-LaGuardia Act, which prohibits injunctions against strikes, does not apply to governmental employees, the court following the rule of construction that statutes which in general terms divest pre-existing rights will not be applied to the sovereign without express words to that effect. (330 U.S. at p. 270 et seq.) The act before us, unlike the Norris-LaGuardia Act, does not affect employees generally but deals specifically with the employees of plaintiff, a public corporation, and with no one else. The rule of construction relied upon in the United Mine Workers case obviously has no application to the situation presented here. Nor is plaintiff's position supported by the analogous rule of construction that statutes in derogation of sovereignty are to be strictly construed in favor of the state. The act expressly declares that it ''shall be liberally construed to carry out the objects and purposes and the declared policy of the State of California as in this act set forth.'' (§ 12.1.) The Legislature, as we have seen, has made clear its purpose of creating an employment relationship comparable to that existing between a privately-owned public utility and its employees, and, if plaintiff's employees were unable to strike, they would be in a far less advantageous position than private employees with respect to collective bargaining. Arbitration procedure authorized by subdivision (c) of section 3.6 in the event of a dispute over wages, hours, or working conditions obviously was not intended to take the place of the right to strike. This procedure may be had only ''upon the agreement of both'' plaintiff and the brotherhood, and in the present case the district rejected a request for arbitration.

There is no merit in plaintiff's claim that provisions of the act granting plaintiff managerial discretion with respect to such matters as the fixing of salaries show that subdivision (c) of section 3.6 was not intended to give the employees the right to strike. The act specifically provides that, ''notwithstanding any other provision,'' plaintiff must enter into a written contract governing working conditions with the accredited representative of the employees. In order to obtain such a contract the employees are authorized to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purpose of col-

lective bargaining or other mutual aid or protection. The employees' right to engage in other concerted activities, which, as we have seen, includes the right to strike, is thus an integral part of the bargaining process. Plaintiff's duty to bargain collectively of course interferes with its managerial discretion, but under the act its obligation in this respect takes precedence over other provisions.

In passing upon the constitutionality of the act as applied to the employees represented by the brotherhood, we are not confronted with the problems which might be posed by legislation giving the right to strike to public employees such as policemen, firemen, and public officers exercising a portion of the state's sovereign powers. Plaintiff's contention is that subdivision (c), as above construed, is invalid because it assertedly constitutes a delegation of governmental authority to private persons and is discriminatory. We do not agree.

Permitting employees to strike does not delegate to them authority to fix their own wages to the exclusion of the employer's discretion. In collective bargaining negotiations, whether or not the employees strike, the employer is free to reject demands if he determines that they are unacceptable.

Plaintiff claims that its position differs from that of private employers, arguing that it could be compelled by mandamus to provide service even though its employees were on strike. However, there is nothing in the act warranting the conclusion that plaintiff does not have discretion to reject unacceptable demands of striking employees, and it could not be forced to provide service where this would require it to abandon that discretion. No case has been found holding that a statute permitting public employees to strike constitutes an improper delegation of governmental authority, and courts both in this state and elsewhere, although not specifically discussing the delegation point, have recognized that statutes which permit strikes by publicly employed teachers, electrical workers, maintenance workers, and longshoremen may be validly enacted. (*Local 266 etc. A.F.L.* v. *Salt River Project Agr. Imp. & Power Dist.* (Ariz.), *supra,* 275 P.2d 393, 396 et seq.; *Board of Education* v. *Public School Employees' Union* (Minn.), *supra,* 45 N.W.2d 797; see *Newmarker* v. *Regents of University of Calif., supra,* 160 Cal.App.2d 640, 646; *City of Manchester* v. *Manchester Teachers Guild* (N.H.), *supra,* 131 A.2d 59, 62; *Port of Seattle* v. *International Longshoremen's & W. U.* (Wash.), *supra,* 324 P.2d 1099, 1102-1103.)

 The fact that statutes creating other transit systems do not contain provisions similar to the one involved here with respect to the right to strike cannot be a proper basis for a claim that subdivision (c) is discriminatory. Section 1.1 of the act provides that because of the "unique problem" presented in the Los Angeles metropolitan area and the facts and circumstances relative to the establishment of a mass rapid transit system there, the adoption of a "special act" and the creation of a "special authority" are required.

 If any state of facts can reasonably be conceived which would support a classification made by the Legislature, the existence of that state of facts is presumed, and one who challenges the classification has the burden of showing that it is arbitrary. (*State* v. *Industrial Acc. Com.*, 48 Cal.2d 365, 371-372 [310 P.2d 7] ; *City of Walnut Creek* v. *Silveira*, 47 Cal.2d 804, 811 [306 P.2d 453].) The Legislature could have concluded that conditions existing in the area relating to the availability of transit workers made it necessary to give plaintiff's employees the right to strike in order to obtain an experienced and efficient working force. For example, at the time the act was adopted in 1957, transit service was principally provided in the area by privately-owned utilities whose employees were represented by labor unions and had the right to strike, and many of these employees might have refused to work for plaintiff if deprived of that right. The act contemplated that plaintiff would acquire such utilities and, as we have seen, provided that their employees should not suffer any loss of benefits. Plaintiff has made no showing that the conditions which exist with respect to other transit systems are the same as those in the Los Angeles area.

The judgment is reversed.

Traynor, J., Peters, J., White, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—In my view Judge Charles R. Thompson, the learned trial judge who decided this case below, was correct in his determination that the employes of plaintiff, as public employes, are without the legal right to strike against plaintiff, and in enjoining them from so doing.

My principal objections to the opinion of the Chief Justice are three:

1. This is the only case in the judicial history of this state or the United States, so far as our research discloses, in which

a court of last resort holds that a statute which does not unequivocally and by clear language grant to public employes a right to strike against the government as an employer, nevertheless confers such right by implication. The two cases cited in the opinion of the Chief Justice as supporting the grant by implication theory are plainly distinguishable on their facts and the statutes there involved. As is hereinafter shown the first of such cases does not deal with a true public corporation or governmental agency and the reasoning of the second, if followed here, would tend to preclude rather than support the majority's holding. Other authorities are to the contrary.

2. The precise language—the so-called 16 words—relied upon in the opinion of the Chief Justice as implying a grant of such right to strike against government has been construed exactly to the contrary by the United States Supreme Court under comparable circumstances.

3. The substance of other provisions of the subject act (hereinafter quoted in certain material parts) and the character of its composition (showing almost meticulous care in detailing and delimiting the powers, duties, rights and obligations of the authority members and employes) tend strongly against the implication found by the Chief Justice.

Admittedly plaintiff here is a public as distinguished from a private corporation and plaintiff's employes who are here represented by defendant union are public employes. The only issue is whether the state has granted such public employes the right to strike against their employer in support of a collective bargaining demand. That right, if it exists, must be found in the Los Angeles Metropolitan Transit Authority Act of 1957 (Stats. 1957, ch. 547; amended by Stats. 1959, ch. 519). Inasmuch as that act does not expressly grant any such right it becomes necessary to:

(a) Determine whether we shall abide by the heretofore unbroken rule that the right will not be deemed to exist unless specifically granted in unmistakable terms and

(b) if the majority decline to follow such rule, to examine the statute and pertinent authorities to ascertain whether the position of the Chief Justice—that a right to strike against the public employer is implied by the language he quotes—is tenable under established law when the quoted language is considered in full context.

Chapter 3 of the subject act is entitled "Creation and Or-

ganization of Authority.'' It contains sections 3.1 through 3.11. This chapter, it is important to note, covers both the managing members and the employes of the authority. The sections of the chapter with which at the outset it is desirable to become familiar, provide as follows:

''Sec. 3.1. There is hereby created the 'Los Angeles Metropolitan Transit Authority.'

''Sec. 3.2. . . . The powers of the authority are those granted by this act. . . .

''Sec. 3.4. The authority is composed of seven members who shall be appointed by the Governor. . . .

''Sec. 3.6. (a) The authority shall appoint a chairman . . . and shall *appoint*[1] or provide for the *appointment* of other officers . . . and *employees* as may be necessary for any purpose of the authority, including . . . the . . . *operation, maintenance, and policing* of the system. . . . *The compensation of . . . all . . . agents and employees shall be fixed by the authority.* . . . The consent of the Department of Finance shall not be required in carrying out the provisions of this Section 3.6. . . . [Italics added.]

'' (c) Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. It is declared to be in the public interest that the authority shall not express any preference for one union over another. . . .''

There follow detailed provisions specifying how an arbitration board shall be selected and how, where there is a dispute, it shall be determined whether a labor organization represents a majority of the employes or whether the proposed unit is appropriate.

The language of the subject act which the opinion of the Chief Justice holds to include by implication the right to strike against government, is that portion of chapter 3 (hereinabove more inclusively quoted) which provides that the public employes ''shall have the right to self-organization, . . . to bargain collectively . . . and to engage *in other concerted activities for the purpose of collective bargaining or other*

---

[1]The use of the words ''appoint'' and ''appointment'' in this subsection (a) and ''appointed to'' in subsection (e), hereinafter noted, appears to be consistent with the governmental status of the employer and employes.

*mutual aid or protection."* This implication, the opinion of the Chief Justice says, is warranted because the same 16 words which are italicized above have been held by the courts to include strikes by *private* employes. In view of the long-recognized rules set forth in cases hereinafter cited, it appears to me that this court may neither logically, nor by historic precedent, hold that by using the quoted 16 words (either in or out of context) the Legislature intended to authorize strikes by *public* employes merely because the same words in different context have been held to include strikes in private employment.

As Judge Thompson (in the superior court) pointed out in his Memorandum of Opinion, although it is reported in 31 American Law Reports 2d 1149, et seq., that the trend has been toward giving public employes union rights and collective bargaining, the same article further declares that (p. 1159) *"in every case that has been reported,* the right of *public* employees to strike is emphatically denied."* (Italics added.) Thus the conclusion is impelled that if, in Judge Thompson's words, "the drastic right to strike against this public agency is given or established it should be done by the Legislature and in clear, precise and certain language after specifically considering the question so that there can be no doubt on the subject, rather than by being read into the Act by implication with resort to speculation and conjecture. . . . [U]nder all the facts and circumstances of this case the right to strike is not impliedly contained in the Act and . . . therefore the employees, through their union . . . do not legally have the right to strike . . ." against plaintiff.

This conclusion is further supported, if not compelled, by the decision of the United States Supreme Court in *United States* v. *Mine Workers* (1947), 330 U.S. 258, 269-279 [67 S.Ct. 677, 91 L.Ed. 884], in which the court was dealing with the Norris-LaGuardia Act (47 Stat. 70, 29 U.S.C., § 101), in section 2 of which, it is noted in the opinion of the Chief Justice in the instant case, *ante,* p. 687, the language of the 16 words "first appeared." In the Mine Workers case the court held specifically and expressly that although under the provisions of the Norris-LaGuardia Act the right of employes of the coal mines to strike was *expressly protected as against private employers,* this right, not having been granted *expressly as against the government,* simply did not exist as against government. This holding was made in the suit

brought by the government after it took possession of the mines (pursuant to Executive Order 9728 of May 21, 1946, 11 F.R. 5593) and the miners (who until that time and event had the right to strike against their private employers) thereby became government employes. In reaching its holding the court said (pp. 269-274 of 330 U.S.) : "Defendants' . . . principal contention is that the restraining order and preliminary injunction were issued in violation of the Clayton and Norris-LaGuardia Acts. We have come to a contrary decision.

"It is true that Congress decreed in § 20 of the Clayton Act that 'no such restraining order or injunction shall prohibit any person or persons . . . from recommending, advising, or persuading others . . .' to strike. But by the [p. 270] Act itself this provision was made applicable only to cases 'between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment. . . .' . . . [W]e cannot construe the general term 'employer' to include the United States, where there is no express reference to the United States and no evident affirmative grounds for believing that Congress intended to withhold an otherwise available remedy from the Government as well as from a specified class of private persons. . . .

"By the Norris-LaGuardia Act, Congress divested the federal courts of jurisdiction to issue injunctions in a specified class of cases. It would probably be conceded that the characteristics of the present case would be such [p. 271] as to bring it within that class if the basic dispute had remained one between defendants and a private employer, and the latter had been the plaintiff below. So much seems to be found in the express terms of §§ 4 and 13 of the Act. . . . The specifications in [p. 272] § 13 are in general terms and make no express exception of the United States. From these premises, defendants argue that the restraining order and injunction were forbidden by the Act and were wrongfully issued.

"Even if our examination of the Act stopped here, we could hardly assent to this conclusion. There is an old and well-known rule that statutes which in general terms divest preexisting rights or privileges will not be applied to the sovereign without express words to that effect. It has been stated, in cases in which there were extraneous [p. 273] and affirmative reasons for believing that the sovereign should also be

deemed subject to a restrictive statute, that this rule was a rule of construction only. Though that may be true, the rule has been invoked successfully in cases so closely similar to the present one, and the statement of the rule in those cases has been so explicit, that we are inclined to give it much weight here. Congress was not ignorant of the rule which those cases reiterated; and, with knowledge of that rule, Congress would not, in writing the Norris-LaGuardia Act, omit to use 'clear and specific [language] to that effect' if it actually intended to reach the Government in all cases.'' It should be noted that in the case at bench, the quoted language is as applicable to the Legislature of California as it was to Congress in the cited case.[2]

Continuing with its decision the court said further: ''[p. 273] But we need not place entire reliance on this exclusionary rule. Section 2, which declared the public policy of [p. 274] the United States as a guide to the Act's interpretation, carries indications as to the scope of the Act. It predicates the purpose of the Act [as, I interpolate, *so does*

---

[2]Further statements of the rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to such effect are that ''The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him [the sovereign] in the least, if they may tend to restrain or diminish any of his rights or interests.'' (*Dollar Savings Bank* v. *United States* (1873), 19 Wall. (U.S.) 227, 239 [22 L.Ed. 80].) ''If such prohibition is intended to reach the Government in the use of known rights and remedies, the language must be clear and specific to that effect.'' (*United States* v. *Stevenson* (1909), 215 U.S. 190, 197 [30 S.Ct. 35, 54 L.Ed. 153].) This principle has also been applied by the courts of California in a variety of situations, and therefore it must be presumed to have been borne in mind by the Legislature when the act here under consideration was drafted. (See *State* v. *Brotherhood of R. R. Trainmen* (1951), 37 Cal.2d 412, 416-420 [1, 2, 3, 4, 5] [232 P.2d 857] [per Gibson, C. J., citing and following the United Mine Workers rule; *cf.*, *California* v. *Taylor* (1957), 353 U.S. 553, 565, [footnote 12] [77 S.Ct. 1037, 1 L.Ed.2d 1034]; *Butterworth* v. *Boyd* (1938), 12 Cal.2d 140, 150 [8] [82 P.2d 434]; *Estate of Miller* (1936), 5 Cal.2d 588, 597 [9, 10] [55 P.2d 491]; *Miles* v. *Ryan* (1916), 172 Cal. 205, 207 [157 P. 5].) Moreover, the Mine Workers case (*United States* v. *Mine Workers* (1947), *supra*, 330 U.S. 258, 269-279] in which the Supreme Court of the United States held that the 16 words did *not* include a right of public employes to strike against government was decided in 1947—some 10 years before the transit act here involved was adopted by the Legislature—and that holding had also presumptively come to the knowledge of the Legislature. (See *Bellman* v. *County of Contra Costa* (1960), *ante*, pp. 363, 367 [1] [5 Cal.Rptr. 692, 353 P.2d 300]; *Buckley* v. *Chadwick* (1955), 45 Cal.2d 183, 193 [11a] [288 P.2d 12, 289 P.2d 242]; *Cole* v. *Rush* (1955), 45 Cal.2d 345, 355 [8] [289 P.2d 450, 54 A.L.R.2d 1137].)

California Labor Code, section 923] on the contrast between the position of the 'individual unorganized worker' and that of the 'owners of property' who have been permitted to 'organize in the corporate and other forms of ownership association,' and on the consequent helplessness of the worker 'to exercise actual liberty of contract . . . and thereby to obtain acceptable terms and conditions of employment.' The purpose of the Act is said to be to contribute to the worker's 'full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives . . . for the purpose of collective bargaining . . . .' *These considerations, on their face, obviously do not apply to the Government as an employer or to relations between the Government and its employees."* (Italics added.)

It should here be once again noted and emphasized that section 2 of the Norris-LaGuardia Act (quoted in full in the Mine Workers case, *supra,* at pp. 273-274, footnote 24, of 330 U.S.) to which the high federal court adverted in the paragraph last above quoted, further sets forth as the "declared . . . public policy of the United States" that the individual worker "shall be free," among other things, from interference in self-organization or "in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Thus, as pointed out in the opinion of the Chief Justice in the case at bench, the section employs exactly the same 16 words which are relied upon in his opinion to support the right to strike against government—the right which was so emphatically denied by the Supreme Court of the United States in the Mine Workers case.

The two cases (*Local 266 etc. A.F.L.* v. *Salt River Project Agr. Imp. & Power Dist.* (1954), 78 Ariz. 30 [275 P.2d 393, 400-402 [13-18]] ; *Board of Education* v. *Public School Employees' Union* (1951), 233 Minn. 144 [45 N.W.2d 797] ) cited in the majority opinion (*ante,* p. 690) as supporting its reasoning and conclusion are neither analogous nor persuasive. The Agricultural Improvement and Power District whose employes were held to have the right to strike in the first of the two majority-cited cases, was, as the court there took considerable pains to point out (pp. 401-402 [15, 16, 18] [275 P.2d]), formed, owned and operated *by private land-*

*holders for the express purpose of engaging in private profitable business.* Thus, despite the general provision of the Arizona Constitution (art. 13, § 7) that irrigation and power districts are "political subdivisions of the state, and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this Constitution or any law of the state or of the United States," the operations of the particular subject district were, in essence, private rather than public. The essential facts, together with the reasoning and conclusion of the Supreme Court of Arizona, appear in the following excerpts from its opinion: (P. 400 of 275 P.2d) "[T]he court in the Los Angeles case ... [*City of Los Angeles* v. *Los Angeles Bldg. & Const. Trades Council* (1949), 94 Cal. App.2d 36, 49 [9] (210 P.2d 305)] stated that ... 'Fair treatment for public employees does not require legal protection for the concerted labor action generally, as in the case of private employment, for such treatment is, in the public field, compelled to a considerable extent by law.' This consideration cannot be said to exist in the case at bar. . . . [P. 401 [15]] To say that the employees of the District herein are actually 'public employees' is not the province of this court but a matter for the legislature. . . . [P. 402 [18]] Most municipal corporations are owned by the public and managed by public officials. It might be said that a strike by the employees of such municipal corporations would constitute a strike against the public. Such is not the case here. Public employment means employment by some branch of government or body politic specially serving the needs of the general public. It cannot be said that the District's employees are paid from the public treasury as are employees of the public. The public does not own the District. A governmental entity such as a city or town does not manage or benefit from the profits of this District. *Instead the owners are private landholders.* The profits from the sale of electricity are used to defray the expense in irrigating these private lands for personal profit. . . . [P. 403] [I]t cannot be said that a strike here is a strike against the public. *The District does not function to 'serve the whole people' but rather the District operates for the benefit of these 'inhabitants of the district' who are private owners.*" (Italics added.)

Under the circumstances shown the holding of the Arizona court is readily understandable; it is *not* understandable to

me how that case can be considered as authority or guide for construing the subject metropolitan authority act as by implication granting the here admittedly *public* employes the right to strike.

And in the second of the majority's relied on cases, *Board of Education* v. *Public School Employees' Union* (Minn., 1951), *supra,* 45 N.W.2d 797, 800-801 [1, 4], the court had before it statutory language which dealt directly and specifically with the right of certain public employes to strike. Such statutory language, as is stated in the opinion of the Supreme Court of Minnesota, appears in that state's " 'Little Norris-LaGuardia Act,' popularly so called because of its near identity to the federal Norris-LaGuardia Act. . . .

"Section 185.10 of our statute provides:

" 'No court of the state shall have jurisdiction to issue any restraining order, or temporary or permanent injunction, in any case involving or growing out of any labor dispute, to prohibit any person or persons participating or interested in such dispute, . . . from doing, whether singly or in concert, any of the following acts:

" '(1) Ceasing or refusing to perform any work or to remain in any relation of employment;'. . . .

"The Minnesota act, M.S.A. c. 185, although modeled after the Norris-LaGuardia Act, contains one feature which materially distinguishes it from the federal act. Section 185.19 of the Minnesota act provides: 'Sections 185.07 to 185.18 [L. 1933, c. 416, § 15] *shall not be held to apply to policemen or firemen or any other public officials charged with duties relating to public safety.'*

"This exception must refer to persons who are not employed by a private employer. The only other employer would be a public employer. Section 185.19 means that a municipality is not prevented from seeking and receiving injunctive relief against these designated employes if the facts otherwise warrant such relief. But a municipality has numerous employes who cannot come under any of these excepted classes. Janitors and janitor-engineers employed by the board of education are plainly not 'officials charged with duties relating to public safety.' If the statute specifically enumerates the employes against whom the municipality may obtain injunctive relief under M.S.A. c. 185, it would seem that it would be prevented from seeking such relief against its other employes, except as provided under c. 185. This interpretation

of the statute is in accord with the well-settled rule that where a statute designates an exception, proviso, saving clause, or a negative, the exclusion of one thing includes all others. . . . The exclusion clause indicates that the act was intended to apply to all other employes.'' (Italics added.)

The court then sets out in some detail the history of the legislation it was discussing, as taken from the Journal of the Senate, and continues (p. 802), ''It is apparent from this legislative history that the legislature considered the bill applicable to public employes. Otherwise, there would have been no need for § 185.19, which excepts the persons designated therein from the operation of the statute. Furthermore, this legislative history shows that the legislature did consider whether public employes should be excepted from the provisions of M.S.A. c. 185, and, having done so, concluded that there should be an exception only for policemen, firemen, and any other public officials charged with duties relating to public safety.'' By contrast, in the case at bench no showing is made that California's Legislature even considered, much less debated and knowingly voted for, a grant to public employes of the right to strike.

Thus, neither of the two cases relied on by the Chief Justice supports the proposition that concededly public employes may derive the right to strike merely because the Transit Authority Act incorporates the 16 words which have been held to include strike rights when applied in private employment. As stated by the United States Supreme Court in *International Union, U.A.W., A.F. of L.* v. *Wisconsin Emp. Relations Board* (1949), 336 U.S. 245, 259 [69 S.Ct. 516, 93 L.Ed. 651], ''The right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized [in *National Labor Relations Board* v. *Jones & L. Steel Corp.* (1936), 301 U.S. 1, 33 [57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352] as a 'fundamental right'. . . .'' The statutory ''interpretation'' by the majority here is the more remarkable in that the only inferred classification of public employes for strike eligibility is employment by the transit authority, regardless of character of work, such as operators, clerks, police, etc.

It is to be emphasized that since a grant of a right to strike against government is essentially a partial surrender of sov-

ereignty the grant should unmistakably come from the sovereignty, not through inferences declared by the majority of a divided court. It may well be that California should include in the Los Angeles Metropolitan Transit Authority Act more of the provisions which are included in the Railway Labor Act, 45 U.S.C.A., elucidating more specifically the procedures to be followed in collective bargaining. But manifestly amendment or augmentation of the Transit Authority Act should be left to the Legislature or the people rather than accomplished by the unicameral act of a majority of this court. This court is not equipped and has not undertaken to conduct a study of the ramifications of its ruling nor has it assumed to define and delimit the conditions upon, the procedures leading to, or the classes of employes who may indulge in, this newly declared right to strike.

That the holding of the majority today is contrary to the weight of authority, statutory as well as decisional, is pointed up by the fact that the Congress of the United States, after the Supreme Court's decision in the United Mine Workers case, undertook to make certain that the views of the dissenters in that case should not become law through a change of personnel in the court. To that end the Congress on June 23, 1947, enacted 61 Stat. 136, ch. 120, 29 U.S.C.A. § 188, which read: ''It shall be unlawful for any individual employed by the United States or any agency thereof including wholly owned Government corporations, to participate in any strike. Any individual employed by the United States or by any such agency who strikes shall be discharged immediately from his employment, and shall forfeit his civil service status, if any, and shall not be eligible for reemployment for three years by the United States or any such agency.'' This forthright position of the United States Congress was reaffirmed when, in 1955, the above quoted section was repealed and reenacted as sections 118p and 118r of 5 U.S.C.A. (69 Stat. 624-625, ch. 690), which provide (§ 118p) that ''No person shall accept or hold office or employment in the Government of the United States or any agency thereof, including wholly owned Government corporations, who— . . . (3) participates in any strike or asserts the right to strike against the Government of the United States or such agency; or (4) is a member of an organization of Government employees that asserts the right to strike against the Government of the United States or such agencies, knowing that such organization asserts such right,'' and that

(§ 118r) "Any person who violates section 118p of this title shall be guilty of a felony, and shall be fined . . . or imprisoned . . . or both."

It is observed that the opinion of the Chief Justice does not discuss the policy of government to protect itself and its citizens as evidenced by the unequivocal language above quoted; nor does the opinion undertake to overrule or disapprove any of the many earlier holdings of the courts of this state which are either irreconcilable or inconsistent with the drastic ruling announced today. Among such cases are *State* v. *Brotherhood of R. R. Trainmen* (1951), 37 Cal.2d 412, 416-420 [232 P.2d 857]; *Nutter* v. *City of Santa Monica* (1946), 74 Cal.App.2d 292, 296-298 [1] [168 P.2d 741] ["[I]t was not the purpose of the Legislature, in the enactment of section 923 [Labor Code], to inaugurate a state policy with reference to labor relations which would be applicable to the state or its political subdivisions . . . Those who enter public employment do not thereby acquire the right to arrange, by negotiation and contract, terms and conditions of employment which are defined by law or, under established systems, are subject to regulation by governmental bodies"]; *Perez* v. *Board of Police Comrs.* (1947), 78 Cal.App.2d 638, 647 [6] [178 P.2d 537] ["Nothing can be gained by comparing public employment with private employment; there can be no analogy in such a comparison"]; *Newmarker* v. *Regents of University of Calif.* (1958), 160 Cal.App.2d 640, 647 [5] [325 P.2d 558] ["Labor Code, § 923, which declares this state's policy in favor of collective bargaining does not apply to public employment"]; *Dropo* v. *City & County of San Francisco* (1959), 167 Cal.App.2d 453, 461 [3b] [334 P.2d 972] ["In *Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292 [168 P.2d 741], the construction rule was applied to the construction of the Labor Code in a decision holding that because governmental bodies were not expressly mentioned in the Labor Code, its provisions requiring bargaining between employers and trade unions did not apply to the defendant city in its operating of local and intercity motor coach lines. Obviously, applying such a requirement to a municipality, even though it was acting in a proprietary capacity, would interfere with sovereign governmental powers. It was so held in that case. In stating the rule of construction the Nutter case said (p. 300) 'general terms of a statute will not be construed as including government if the statute would operate to trench upon sovereign rights, injuriously affect the

capacity to perform state functions or establish a right of action against the state' "] ; see also *Balthasar* v. *Pacific Elec. Ry. Co.* (1921), 187 Cal. 302, 305 [202 P. 37, 19 A.L.R. 452], quoting the rule from Blackstone's Commentaries.

The conclusion that by using the quoted 16 words the California Legislature did *not* intend to authorize strikes by *public* employes merely because the same words in different context have been held to include strikes against *private* employers appears doubly inescapable when the matter is considered in the light of the wealth of additional detail declaring and delimiting employes' rights which the Legislature has expressed in other provisions of the act. In this connection it may first be noted that this Transit Authority Act comprises 13 chapters which fill over 31 printed pages of the Statutes of 1957. The 1959 amendments of the act (Stats. 1959, ch. 519) cover more than four and one-half printed pages. As already related in part, in section 3.6, subdivision (c), of the act, provision is made for representation of the employes by a labor union of their own choosing, and subdivision (d) provides in mandatory language how such choice shall be ascertained, thus plainly negating any permission to strike to achieve objectives on that score. Subdivision (c) further provides that "In case of a dispute over wages, salaries, hours or working conditions, which is not resolved by negotiations in good faith between the authority and the labor organization, upon the agreement of both, the authority and the labor organization may submit said dispute to the decision of the majority of an arbitration board, and the decision of the majority of such arbitration board shall be final." Again, subdivision (c) repeats later that "The decision of a majority of the arbitration board *shall be final and binding* upon the parties thereto." (Italics added.) The method of choosing such board is spelled out in detail. It is also specified that there shall be no discrimination against any employe or person because of race, creed, color or sex. In my view, the very fact that the Legislature has thus declared so explicitly an authorized means of settling disputes "over wages, salaries, hours or working conditions" plainly shows that it had no intention of granting the transit authority's employes the right to use the much more drastic procedure of calling a strike against government to settle such disputes. If the right to strike were to be granted at all, it is reasonable to infer that the Legislature would have been at least as specific in expressing the grant and in detailing the circumstances of its exercise.

The opinion of the Chief Justice in support of its thesis that the 16 words do by implication extend such a grant, argues (*ante,* p. 692) that "The Legislature . . . has made clear its purpose of creating an employment relationship comparable to that existing between a privately owned public utility and its employees, and, if plaintiff's employees were unable to strike, they would be in a far less advantageous position than private employees with respect to collective bargaining," and notes (*ante,* p. 692) that the act directs that it "shall be liberally construed to carry out the objects and purposes of the declared policy of the State of California *as in this act set forth*" (§ 12.1, italics added). This "declared policy" is specifically enunciated in section 1.1 of the act, in the following words: "It is hereby declared to be the policy of the State of California to develop mass rapid transit systems in the various metropolitan areas within the State for the benefit of the people." (See also *Los Angeles Met. Transit Authority* v. *Public Utilities Com.* (1959), 52 Cal.2d 655, 661-662 [2] [343 P.2d 913].) To me it would appear that the Legislature's mandate that the act be liberally construed to carry out the expressly defined policy of *developing mass rapid transit systems for the benefit of the people,* constitutes a proscription against, rather than authority for, this court's reading into the statute an authorization to employes of such systems to strike and thus put the systems temporarily out of operation to the detriment rather than the benefit of the public. As hereinabove shown it is established law that no right to strike against government exists unless that right be conferred by the Legislature in no uncertain language. This the Legislature has not done in the provisions of the act as they now read; no argument in the opinion of the Chief Justice bedims that simple fact.

It bears emphasis that the state has expressly granted to the defendant employes (§ 3.6(c)) "the right to self-organization, to form, join or assist labor organizations, to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining" and the subject act further expressly provides that (§ 3.6(e)) "Whenever the authority acquires existing facilities from a *publicly* or *privately* owned public utility . . . the authority shall assume and observe all existing labor contracts. To the extent necessary for operation of facilities, all of the employees of such acquired public utility whose duties pertain to the facilities

acquired shall be *appointed*[1] *to* comparable positions in the
authority without examination, subject to all the rights and
benefits of this act, and these employees shall be given sick
leave, seniority, vacation and pension credits in accordance
with the records and labor agreements of the acquired public
utility. Members and beneficiaries of any pension or retirement
system or other benefits established by that public utility shall
continue to have the rights, privileges, benefits, obligations
and status with respect to such established system. No em-
ployees of any acquired public utility shall suffer any worsen-
ing of his *wages, seniority, pension, vacation or other benefits*
by reason of the acquisition.'' (Italics added.)

It is obvious that the last quoted section—and, in particular,
the last sentence—is specific and express in declaring the
authorized rights of employes of either publicly or privately
owned utilities which are acquired by the transit authority but,
significantly in the light of the law as declared in such cases
as *United States* v. *Mine Workers* (1947), *supra*, 330 U.S. 258;
*State* v. *Brotherhood of R. R. Trainmen* (1951), *supra*, 37 Cal.
2d 412, 416-420 [1, 2, 3, 4, 5]; and *Board of Education* v.
*Public School Employees' Union* (Minn., 1951), *supra*, 45
N.W.2d 797, 800 et seq., there is no mention of the grant of a
right to strike against the governmental employer after the
employes become *public* employes. The same observation ap-
plies with possibly even greater force to the amendment added
in 1959 (Stats. 1959, ch. 519, p. 2488, § 3.6, subd. (h)) : ''The
obligation of the authority to bargain in good faith with a duly
designated or certified labor organization and to execute a
written collective bargaining agreement . . . and to comply
with the terms thereof shall not be limited or restricted by the
provisions of the Government Code or other laws or statutes
and the obligation of the authority to bargain collectively
shall extend to all subjects of collective bargaining which are
or may be proper subjects of collective bargaining with a
private employer.'' Here again, there is no mention of a right
to strike against the governmental employer. It bears emphasis
that a strike is not, in any ordinary usage of the term, an
object or subject of collective bargaining; it is a weapon some-
times used in the process of, or in seeking to acquire the right
to, collective bargaining. The fact that it may be labor's most
powerful—and drastic—weapon certainly does not suggest
that it is, therefore, to be deemed granted by implication as

[1]See footnote 1, *ante,* p. 696.

against government when it is not expressly mentioned in a statute as specific and detailed in all other respects as that now before us. It is manifest also that no demand by employes against the authority would be lawful unless the demand was within the powers conferred by the statute. This follows from the specificity of the provision that "The powers of the authority are those granted by this act" (§ 3.2) ; such language must mean that the authority possesses no powers other than those granted by the act.

Moreover, the Legislature has not only authorized both the authority and its employes to engage in collective bargaining, but it has likewise (§ 3.6, subd. (c)) authorized the authority and the union representing the employes to provide in a collective bargaining agreement for submission of any "dispute over wages, salaries, hours and working conditions, which is not resolved by negotiations in good faith between the authority and the labor organization . . . to the decision of the majority of an arbitration board, and the decision of the majority of such . . . board shall be final." As already noted, detailed provisions follow concerning how the arbitration board shall be selected. And certainly provisions for arbitration contained in any collective bargaining agreement can be specifically enforced according to such provision. Certainly, also, in the light of such detailed spelling out by the Legislature of the rights and obligations of both the authority and its employes, including the labor organization formed or selected by the latter, to engage in collective bargaining and in arbitration, it further plainly appears that if granting the right to strike had been intended, words expressly so stating would have been added.

It may also be significant in this connection that section 4.24 of the act (as amended by Stats. 1959, ch. 519) states that: "The authority may provide for a retirement system ; provided, that the adoption, terms and conditions of any retirement system covering employees of the authority represented by a labor organization in accordance with Section 3.6 shall be pursuant to a collective bargaining agreement between such labor organization and the authority." Obviously, the language used is, in the basic premise, permissive. There is neither an express statement nor an implication in the quoted language that the Legislature intended thereby to grant to the interested labor organization the right and authority to call out on strike the authority's employes as a means of "per-

suading'' that public authority to agree to any terms demanded.

If the Legislature in drafting the act could and did speak in such careful and specific detail in granting, defining and protecting the bargaining and other rights of the public employes here involved, it seems obvious that if it had been intended that such employes be given the additional, drastic and heretofore universally denied, right to strike against government, that right would also have been expressly enunciated and delimited in no uncertain terms and not left for court deduction following comparison with the language used in statutes dealing with employes of private employers. The traditional rule *"expressio unius est exclusio alterius"* thus seems peculiarly applicable to this case.

In this connection it is appropriate to add that we are not, of course, concerned here with any question or necessity of finding within the terms of the act any specific or implied negation of the right to strike. On the contrary the burden is on defendant to show wherein the act effectively grants any such right. This necessarily follows from the firmly established general rule which none has heretofore disputed, that public employes, absent express authorization, are without the right to strike against government. The attempted analogy in the opinion of the Chief Justice in relying upon use of the so-called 16 words in statutes dealing with the rights of private employes (e.g., § 923 of the California Labor Code) is for this further reason, in my view, invalid. Use of the 16 words in such statutes of course operates only to confirm, and *not* to *confer or grant*, to private employes the right to strike; that right is a fundamental one which springs from constitutional guaranties and decisional common law, subject to certain restrictions in its exercise. (Eg., see *Amalgamated Utility Workers* v. *Consolidated Edison Co. (1940)*, 309 U.S. 261, 263 [1] [60 S.Ct. 561, 84 L.Ed. 738]; *(J. F.) Parkinson* v. *Building Trades Council (1908)*, 154 Cal. 581, 599-600 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550].) "[T]he legality of the closed shop, and of the strike and boycott, primary and secondary, . . . were recognized by this court at a comparatively early date, under common law principles. . . ." (*Chavez* v. *Sargent (1959)*, 52 Cal.2d 162, 178 [8] [339 P.2d 801].)

Further confirming my view of the intent of the Legislature is the fact that in chapter 5 of the subject act the transit authority (plaintiff herein) is authorized to issue revenue

bonds "for the acquisition, construction or completion of the system or any part thereof . . ." (§ 5.1), and section 5.9 specifies that "An indenture may include a clause relating to the bonds issued thereunder requiring the authority to *continuously operate the system* acquired, constructed, or completed, in whole or in part, from the proceeds of the bonds in an efficient and economical manner." (Italics added.) Obviously, if the opinion of the Chief Justice stands (construing the act to authorize the system's being struck by its employes when their self-determined demands are not met) any indenture clause requiring continuous operation must necessarily mean—if the bond is not to be defaulted—that this public corporation must at any cost meet any terms demanded by the employes' union as a condition for keeping the system in operation. Again, such a result would appear to be flatly contrary to the declared policy of the state "to develop mass rapid transit systems . . . for the benefit of the people," and irreconcilably obnoxious to the heretofore established principle that a free government should not surrender its control to a private group.

It would seem to me that reading the right to strike into the act may seriously interfere with the value and salability of the revenue bonds provided for in chapter 5, which chapter contains 42 sections specifying in detail the provisions which may or may not be included in such bonds. If a strike with its potential interruption of operations was contemplated by the Legislature, then not only, under previously discussed law, should the authorization have been expressly set forth, but the act in the chapter authorizing revenue bonds should have expressly dealt with what steps the authority should take "to continuously operate the system" in the event of a strike.

The state, to provide dependable rapid transit for the public, created this publicly owned common carrier and made it independent of the Public Utilities Commission (*Los Angeles Met. Transit Authority* v. *Public Utilities Com.* (1959), *supra*, 52 Cal.2d 655, 661 [1, 2]) and yet, the majority today hold, a union representing the employes may lawfully call a strike and, inferentially, thereby shut down service to the public! (*Cf. Northwestern Pac. R. R. Co.* v. *Lumber & S. W. Union* (1948), 31 Cal.2d 441, 446 [2] [189 P.2d 277].) Will such interruption of service be lawful because the union has a right to cause it? Or must the authority, to avoid unlawful inter-

ruption of service, yield to the union's demands? I do not understand the reasoning which makes the authority, because it is publicly owned, independent of the Public Utilities Commission but which also makes it, as though it were a private corporation, subject to strike on union call.

In conclusion it bears mention again (see *ante*, p. 696) that section 3.6, subdivision (a), requires that "The authority shall appoint . . . employees as may be necessary for . . . policing of the system" as well as for its operation and maintenance. In the event of a strike it would appear probable that "policing of the system" for protection of personnel and maintenance of equipment might well be all the more essential in the public interest. The opinion of the Chief Justice in declaring the grant by implication does not undertake to spell out any differentiation as among groups or classes of employes who are to have or have not the court-declared right to strike. Presumably, therefore, the police of the authority, trained in the skills necessary to protect the affected public property, would likewise be out on strike or respecting a picket line. Will the faithful but already overburdened police of Los Angeles city and the like sheriff's deputies of the county be called upon to fill this breach? Or will the vast properties of the transit authority go unprotected?

As has been shown, under both federal and state law as it existed at the time the Los Angeles Metropolitan Transit Authority Act was drafted and enacted, a right—actually, a privilege—to strike against government was never to be deemed granted by implication. Until today, such "right" had to be expressly granted in no uncertain language or it simply was not granted. The granting of such a privilege is a *pro tanto* surrender of sovereignty; i.e., a transfer of sovereignty in a limited field from the State of California to a labor union. But how limited is the field? The opinion of the Chief Justice does not attempt to discuss the potentialities of the problems with which his holding is fraught. Is the classification of public employes for strike purposes lawful? If employes of the Los Angeles transit authority are granted the "right" to strike, why not other public employes? Are the policemen of the transit authority constitutionally different from other police groups? There are other provisions of the act, as well as further considerations of the public interest, which could be recited as bearing against either the innovation of law or the implication of fact encompassed in the opinion of the

Chief Justice, and as supporting the holding I advance. But if the reasons already given have not persuaded, then, I think, further elaboration would be in vain.

I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied October 27, 1960. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.