Marshall E. Livingston, J.
This action was duly commenced by service of the summons and verified complaint included with supporting documents in an order to show cause for an injunction to prevent defendants from engaging in a strike in contravention of section 210 of the- Civil Service Law. Service was effected on November 2, 1970, and an answer on *866 behalf of defendants was filed November 4, 1970, when this motion came on to be heard before me at Special Term.
The complaint seeks a permanent injunction against the defendant Local Division 282 of the Amalgamated Transit Union, AFL-CIO (Union) and its members from calling and engaging in strikes against the plaintiff as a public employer by reason of the provisions of the Public Employees’ Fair Employment Act (Civil Service Law, art. 14), also known as the Taylor Law.
The answer demands the plaintiff’s petition and complaint be dismissed because the union members, the Union asserts, are private, not public, employees. It also asks the court to grant a declaratory judgment, declaring the employment status of the members of the defendant Union, that is, whether said employees are private employees of City Lines Management Corporation (City Lines) or whether they are public employees of the Rochester-G-enesee Regional Transportation Authority (RmG- RTA) or public employees of the plaintiff (RTS), a public benefit subsidiary corporation of the R^G- RTA. It further asks that any penalties or fines sought by plaintiff pursuant to the Taylor Act be denied.
There are no questions of fact to be determined on this application. The parties, as shown by the pleadings, exhibits and affidavits before me on the motion, are in substantial agreement concerning the history, chronology, nature and character of events which gave rise to this proceeding. Only questions of law and the interpretation and effect thereof upon this situation need be decided.
Is either RTS or its parent R-G- RTA the public employer of the bus operators, mechanics, washers and others who are members of the defendant Union?
Have the union members retained the status of private employees of City Lines by reason of an ineffective attempt to transfer the facilities of the transit system of the Rochester Transit Corporation (RTC) via the City of Rochester (City) to a public employer under specially enacted legislative authority?
The history of some of the pertinent events leading to the present action is appropriate as a background upon which the effect in this case of the Public Authorities Law creating R-G RTA and the Taylor Act depend.
About December 1, 1967 the Union went on strike against RTC, the then private business corporation which owned and operated the transit system in the City and its environs. The *867 issues involved were wages, pensions and other matters to be considered in a new collective bargaining agreement to be effective from November 1, 1967 until November 1, 1970. The strike continued into January 1968, and no settlement was in sight. During this period the Mayor of Rochester and the City Manager of Rochester actively participated in trying to bring the parties together. On January 24, 1968 the City and RTC entered into an agreement which set forth the terms and procedures whereby the City would acquire the assets of RTC. After the City and RTC executed the agreement, the new collective bargaining agreement, retroactive to November 1, 1967 and effective for three years, was entered into between the Union and RTC, and the strike ended.
From then until May 22, 1968, the City and RTC negotiated the terms of the transfer, and the City subsequently formally acquired all RTC’s assets and facilities.
It is noted, however, that the City had a valuation proceeding in a condemnation action then pending against RTC, which hopefully was to resolve among other things the respective responsibilities of RTC and the City under the Union’s pension plan. Consequently, some of the agreements during this period recite the pendency of the condemnation proceeding, which never was concluded because RTC and the City settled.
On May 23, 1968 the City contracted with City Lines to furnish services for the operation of the bus lines. These services included the furnishing and employment of the personnel and labor relations problems.
On June 17, 1968 certain amendments to the collective bargaining agreement were agreed upon and executed by the Union and City Lines. On that day too the City agreed with the Union in a separate document to guarantee all pension rights of the former employees of RTC who were union members.
When the City entered the picture and agreed to buy RTC, it made application for State and Federal funds. The Federal application was made to the United States Department of Transportation under the Urban Mass Transportation Act of 1964 (U. S.- Code, tit. 49 §§ 1601-1611). This required the City to execute a so-called section 13(c) agreement (U. S. Code, tit. 49, § 1609, subd. [c]) for the purpose of protecting the interests of employees of the transit system. Because the application had several interlocking dependent facets with the collective bargaining amendments and the City’s pension guarantee, the required section 13(c) agreement was also executed June 17,1968 between the City, the County of Monroe and the Union.
*868 In order for the City to qualify for Federal financing under the Urban Mass Transportation Act and establish a publicly owned and operated transit system in the Rochester metropolitan area, it was set forth in a portion of the preamble of the agreement:
“whereas, tlie employees of the Company [RTC], which is the present operator of urban transit service in the Rochester metropolitan area, are represented by Local Division 282, Amalgamated Transit Union, AFL-CIO (‘ Union ’); and
“ whereas, the City and the County of Monroe County ’) have reviewed the political and financial implications of public acquisition of the Company’s transit system and have charted a plan of action to provide transportation services to the county-city metropolitan community; and
‘ ‘ whereas, under the arrangements agreed upon by the City and the County, it is contemplated that the City will acquire^ the assets of tire Company on or about May 22, 1968, that the City will employ a management company, National City Lines Management Company of Rochester (‘ Management Company ’) to operate the system during the first several months of operation, and that the City will thereafter, as soon as the necessary statutory authority is obtained from the New York State Legislature, transfer the operation of the system to the RochesterGrenesee regional transportation authority or other public authority or joint city-county agency; and
‘ ‘ whereas, it is the intention of both the City and the County that the employees represented by the Union will, upon public acquisition of the Company’s transit system, become employees of the Management Company and become public employees only at such time as a permanent agency for the operation of the transit services is created”.
The Union thus knew and recognized that a public employer authorized under the Public Authorities Law was about to replace RTC, the long-time private employer. In substance the City had contracted with City Lines to operate its transit system only as in interim measure until the City could transfer the transit system to a legally constituted public authority.
Section 2 of chapter 1124 of the Laws of 1969 (Public Authorities Law, § 1299-aa to § 1299-xx) created R-Gr RTA effective August 1, 1969. The R-Gr RTA Act provided in subdivision 5 of section 1299-hh that R-Gr RTA could incorporate a wholly owned public benefit subsidiary which would have all the powers of R-Gr RTA except the power to contract indebtedness.
However, section 1299-gg of the Public Authorities Law provides among the general powers of the authority, and hence *869 the subsidiary, in subdivision 14 thereof: “ To enter into collective bargaining agreements with labor representatives duly elected by the employees of the authority
At the Union’s request in December of 1969 City Lines guaranteed to the Union and its employees the benefits under the pension plan.
In May, 1970 the New York State Legislature passed the act authorizing the City to sell all the properties and facilities of the transit system to R-Gr RTA (L. 1970, ch. 794).
Plaintiff here was incorporated July 21, 1970. A few days later R-Gr RTA notified the United States Department of Labor by letter that it was about to acquire the Rochester Transit System through the plaintiff, its public benefit subsidiary corporation. The letter went on to say that the City had obtained a capital project grant to finance its purchase of the system pursuant to the Urban Mass Transportation Act and therefore executed a section 13(c) agreement with the Union. R-G- RTA advised that it acknowledged the obligations and duties of its subsidiary, the plaintiff herein, to fully comply with the section 13(c) agreement.
On August 11, 1970 the United States Department of Transportation (the Urban Mass Transportation Administration) approved the transfer of the system from the City to R-G RTA. Thus on August 25, 1970 the transfer agreement which provided for closing on September 1, 1970 was executed bv the City and R-U RTA.
On September 1, 1970 R-Gr RTA acquired the system and the plaintiff entered into a management agreement with City Lines relating strictly to operation of the system. At the same time City Lines assigned all its rights and privileges and delegated all its duties and obligations to the plaintiff with respect to the collective bargaining and pension agreements previously entered into 'between City Lines and the Union. The plaintiff accepted the assignment.
It should be noted here that during the period of the City’s ownership of the transit system from January, 1968 through August, 1970, City Lines was delegated by the City to: 11 assume the active management and direction [of the transit system] * * * for and on account of the City, including * * * labor relations * * * In this connection, the Company [City Lines] will assume as the successor employer the collective bargaining agreement presently in effect between RTC and Division 282, Amalgamated Transit Union” (italics supplied).
In none of the collective bargaining agreements, amendments thereto, or pension plan agreements, is there any requirement *870 of Union approval or participation in the event of an assignment of the documents. Almost uniformly the agreements provide that they shall he binding upon the parties, their successors and assigns. In view of the negotiations going on to make the transit system a public one, assignments of contracts were recognized and expected.
Following the acquisition of the transit system by the plaintiff, events moved rapidly and culminated in this action.
The Union notified the Federal mediation people on August 31,1970 that the collective bargaining agreement between it and City Lines would expire on November 1,1970.
Plaintiff on September 28 wrote to the same people and advised that on August 31, 1970 it had acquired the assets of the transit system from the City and was now the employer of the employees in the Union. Accordingly, the plaintiff wrote, ‘ ‘ our labor relationship is now governed exclusively by the Public Employees Fair Employment Law of New York State [Taylor Act]. Hence the * * * notice to you [by the Union] is unnecessary ”.
The Union’s attorneys promptly on October 1, 1970 again wrote mediation services disputing the plaintiff’s contention and advised that, ‘ ‘ an issue has been raised by the Union whether or not the Regional Transit Service or City Lines Management 'Corp. is or is not the present employer ”.
Finally,-on October 13, 1970 the defendant Union by letter to the plaintiff and others advised that it would not recognize plaintiff, a public benefit subsidiary corporation of R-Gr RTA, as the employer of the union members. In substance the Union took essentially the same position as it does in this action. The Union claims plaintiff, as a public benefit subsidiary corporation, specifically has no “power to contract indebtedness” (Public Authorities Law, § 1299-hh, subd. 5).
Therefore, the Union argues plaintiff cannot assume the obligations of (1) the section 13(c) agreement, (2) the collective bargaining agreement, or (3) the pension agreement, because to do so would be contracting to incur indebtedness. The defendants say that such acts by the plaintiff are ultra vires and null and void. Accordingly, City Lines continues to be recognized by the Union as the employer of its members.
A determination of the effect of the specially enacted Public Authorities Law (§ 1299-aa to § 1299-xx), authorizing and creating R-Gr RTA on August 1,1969, is necessary to decide the status of the transit system employees as private or public employees.
The basic principle of such a determination was succinctly expressed by Chief Judge Ftjld in Rankin v. Shanker (23 N Y *871 2d 111, 114) when he said: “ Our discussion of the statutory question may well begin by noting that a primary command to the judiciary in the interpretation of statutes is to ascertain and effectuate the purpose of the Legislature. In finding such purpose, one should look to the entire statute, its legislative history and the statutes of which it is made a part. (See, e.g., Matter of Hogan v. Culkin, 18 N Y 2d 330, 335; Levine v. Bornstein, 4 N Y 2d 241, 244; see, also, McKinney’s Cons. Laws of N. Y., Book 1, Statutes, §§ 92, 95, 96, 97, 98, 111.) ”
The Legislature’s finding and purpose of the R-Gr RTA Act (L. 1969, ch. 1124, § 1) declared that the co-ordination of all phases of transportation and allied services is essential for the residents of the western central part of the State, including Monroe County, and in order to insure a healthy economy, it is necessary to take appropriate measures and assume responsibility for the preservation and improvement of transportation and related services in such area.
The legislative intent negates the idea of a public authority turning over union members to a private corporation in order to duck the responsibility for labor relations procedures required by the Taylor Law.
The Taylor Act, among other things, forbids strikes by public employees and procedurally spells out the framework and specific steps whereby collective bargaining disputes between the public employer and its employees, as duly represented by the union of their designation, must be resolved.
The constitutionality of “ Taylor ” has been considered and upheld by the New York Court of Appeals and the United States Supreme Court. Furthermore, New York State, it was said in City of New York v. De Lury (23 N Y 2d 175, 182), “ in governing its internal affairs, had the power to prohibit any strike if the prohibition was reasonably calculated to achieve a valid State policy in an area which was open to State regulation (See, also, Rankin v. Shanker, 23 N Y 2d 111, supra.)
The United States Supreme Court in McGowan v. Maryland (366 U. S. 420, 425-426), as quoted in Rankin v. Shanker (supra, p. 119) said: “ Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State’s objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will *872 not be set aside if any state of facts reasonably may be conceived to justify it.”
Chief Judge Ftjld then went on to say in Rankin v. Shanker (supra, p. 119): “ Certainly, a reasonable distinction may be drawn between public and private employment; reasonableness of a classification under constitutional standards is always influenced by time and circumstances. It is sufficient to note that, as of the present, legislative differentiation between public and private employees, insofar as restrictions on their right to strike and to jury trials are concerned, is reasonable.” These principles are also applicable in the case here.
There is no question but that the enabling acts, legislation and transfers, assignments, agreements, applications for funds, both State and Federal, all were planned, hewn out and fashioned so as to give metropolitan Rochester a transit system operated by a public authority under the ground rules of the Taylor Act, which primarily forbids strikes and substitutes prescribed mediation instead.
In my judgment, after considering the many exhibits, affidavits, exhaustive well-prepared briefs and arguments of able counsel, I hold that the members of the defendant Union are public employees of the plaintiff, a public authority employer, and that the plaintiff is entitled to the permanent injunction it seeks.
I have considered the pertinent positions taken by the defendants and allude to them so that defendants will know they have not been overlooked.
A comparison of the management agreements between the City and City Lines on May 23,1968 and the management agreement between RTS and City Lines on September 1, 1970 is first considered.
The Union asserts its agreement with RTS on September 1, 1970 is “ basically the same ” as, and “ very much similar ” to its agreement with the City on May 23, 1968. The “ only difference ”, defendants say, being that payroll checks formerly issued by City Lines, which was reimbursed by the City, now are issued by the Regional Transit Service Fund.
However, there appear to me to be several substantial changes in the relationship of City Lines with the City in its agreement of May 23,1968 and its relationship with RTS in the agreement of September 1, 1970:
(1) Paragraph 1 of the City’s agreement required City Lines to furnish the personnel necessary for the City’s operation of its transit system; whereas, paragraph 1 of the RTS agreement *873 required City Lines to furnish only the management personnel necessary for ETS ’ operation of the facility.
(2) Paragraph 3 of the ETS agreement excluded the active management and direction of labor relations from City Lines which was a responsibility of City Lines with the City.
(3) In paragraph 4 of the City’s agreement, City Lines was to provide all personnel, other than management personnel, needed for the operation of the bus lines, including the operators, maintenance, office, clerical, supervisory, foremen, dispatchers and others. The ETS agreement significantly had no such requirement, the logical inference being, of course, that ETS or some one other than City Lines would employ the transit line’s operating force.
(4) Paragraph 7 of the City’s agreement required City Lines to provide at its own expense a resident manager, superintendent of maintenance, controller and a superintendent of transportation in addition to all the operating personnel required in paragraph 4 of the City’s agreement. Paragraph 6 of the ETS agreement required that the only employees to be furnished by City Lines were the four management personnel indicated, i.e., Eesident Manager, Superintendent of Maintenance, Controller and Superintendent of Transportation.
(5) In paragraph 13 of the ETS agreement, it agrees to indemnify City Lines against claims for personal injury, death or property damage resulting from any negligent act “ on the part of any employee of ” ETS. However, “ when the liability results from the negligence of the superintendent of maintenance or the superintendent of transportation (employees of City Lines required under Paragraph ‘ 6 ’ hereinbefore) in the operation of buses of the Corporation [ETS] for purposes of testing’ the bus drivers or in an emergency situation; and, in the event that any such personal injury, wrongful death or property damage shall be caused or contributed to by a negligent act on the part of such an employee of City Lines, City Lines shall be indemnified [by ETS] as above provided.”
In the City’s agreement there was no such provision whatever. Significantly, indemnification of City Lines by ETS against the acts of ETS’ bus drivers as well as the acts of City Lines’ superintendents of maintenance and transportation when “ testing the bus drivers ” clearly indicates when the agreement was made that the bus drivers were considered by both ETS and City Lines to be employees of ETS.
Parenthetically, it should be noted that the ETS management agreement of September 1,1970, cannot be viewed as self-serving on the question- of whether City Lines or ETS was to be the *874 employer of the union members, because it was not until October 1, 1970 when the Union, through its attorneys, for the first time, raised the issue. This was then followed by a letter from the Union dated October 13, 1970, which, for the first time, also characterized the issue of private versus public employee.
(6) The City’s agreement with City Lines also provided, in paragraph 21, upon the termination of the agreement, 11 the City or the Authority (if the Authority has assumed this agreement) shall assume * * * all * * * obligations of the Company [City Lines] in connection with the providing of the management services * * * the furnishing of personnel necessary for * * * operation and any * * * other undertakings by the Company for the City hereunder ” (italics supplied).
This emphasizes that in May, 1968 City Lines and the City were aware of and provided for some of the problems which would arise when the then unborn Authority would take over from the City. Such a paragraph, of course, is not included in the RTS agreement because RTS in fact by agreements, assignments and assumption of duties and liabilities undertook to do the things formerly required by paragraph 21.
(7) Paragraph 22 of the City’s agreement provided that City Lines would not discriminate and would treat all its employees equally in all respects. This again highlights City Lines’ position with the City. It was required to and did exercise the function of a private employer of its employees as a temporary measure until a public authority could take over and the Taylor Law apply.
The argument is made that the Federal Labor Management Relations Act (U. S. Code, tit. 29, §§ 151, 152, subd. [2] et seq.) and the New York State Labor Relations Act (Labor Law, art. 20) pre-empt and oust the Public Authorities Law (art. 5, tit. 14) and the Taylor Act (Civil Service Law, art. 14) from jurisdiction. Having held that the defendant union members are public employees, they are specifically excluded from coverage under both Federal and State Law (see U. S. Code, tit. 29, § 152, subd. [2] and New York State Labor Law, § 715).
The California case of Los Angeles Metropolitan Tr. Auth. v. Brotherhood of R. R. Trainmen (54 Cal. 2d 684) cannot be considered persuasive in this case. The statute there under interpretation was the Los Angeles Metropolitan Transit Authority Act of 1957. Subdivision (c) of section 3.6 of the act provides: “ Employees [of the Transit Authority] shall have the right * * * to engage in other concerted activities for the purpose *875 of collective bargaining or other mutual aid or protection ” (italics supplied).
The court then construed concerted activities or concerted action as an “ inclusive term referring to strikes, picketing, and boycotts ” (Los Angeles Metropolitan Tr. Auth. v. Brotherhood of R. R. Trainmen, supra, p. 689).
The New York law, however, expressly prohibits strike activity in a public employee situation (Civil Service Law, § 210).
The section 13(c) agreement does not aid the transit workers and preserve for them their economic right to strike, as defendants urge. I pass over the semantics of whether the right to strike is one of the economic measures preserved under the section 13(c) agreement or whether it is a weapon employed in collective bargaining. It is clear that the agreement in substance had a dual connotation:
(1) It recognized that the City was the temporary, interim owner of the transit system, and under this arrangement City Lines, a private corporation, was the employer of the union members.
(2) It recognized that the union members would “ become public employees only at such time as a permanent agency * * * is created ”. However, the last sentence of paragraph 4 of the section 13(e) agreement provided: “ Nothing in this paragraph shall be construed to enlarge or limit the right of either party to utilise, upon the expiration of any collective bargaining agreement-, any lawful economic measures that are not inconsistent or in conflict with applicable law.” (Italics supplied.)
I hold that, as public employees, striking is an economic measure which is inconsistent or in conflict with applicable law.
The defendants also argue that this action must fail solely because of the prohibition in the creation of a wholly-owned subsidiary public benefit corporation which specifically denied plaintiff ‘‘ the power to contract indebtedness ’ ’ (Public Authorities Law, § 1299-hh, subd. 5). Even, defendants say, if plaintiff is a public employer with the union members its employees, it cannot assure or guarantee the pension rights of the union members because these rights are a future obligation of the corporation, and as such, the rights are an indebtedness which the plaintiff has no power to contract. I do not equate contracting of a future obligation as a contract of indebtedness. The documents before me specifically indicate that R-Gr RTA is primarily responsible for the union members ’ pension rights.
*876 The transfer agreement between R-Gr RTA and the City dated August 25, 1970 specifically provides in paragraph 2 that the Authority will execute and deliver to the City an undertaking wherein it will assume and pay or discharge self-insurance reserves, accrued pension expense, and all obligations of the system, including, without limitation, union pension plans and collective bargaining agreements with the Union, as well as the section 13(c) agreement, and in paragraph 9 thereof that the Authority will undertake and guarantee to discharge all the obligations of the system, including all contracts and commitments thereof.
Lastly, the defendants ask that any penalties and fines sought by plaintiff pursuant to the Taylor Act be denied. Suffice it to say plaintiff has no standing nor has it sought sanctions against the defendants. Those questions are for consideration by the Public Employment Relations Board upon a proper proceeding being instituted under section 210 of the Civil Service Law.
However, it appears to me that a good faith, valid question as to the status of the union members has been presented. Apparently, it is believed that the union members were private' employees under the City ownership, which perhaps lulled them into a sense of security and led to the issues here. Despite the fact that I hold they were wrong in the conclusion that such status continued, if it did exist, the Union, I find, on counsel’s advice, made prompt, good faith efforts to and did terminate the strike and obey the restraining order made by Mr. Justice Easton on October 31, 1970, continued by me on November 4, 1970, and which has now ripened into a permanent injunction.